[Cite as *Henderson v. SMC Promotions, Inc.*, 2014-Ohio-4634.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
ERIE COUNTY

John Henderson, et al.                                    Court of Appeals Nos. E-12-068
                                                                                              E-13-047
        Appellants/Cross-Appellees

                                                                    Trial Court No. 2009-CV-0576
v.

SMC Promotions, Inc., et al.                         **DECISION AND JUDGMENT**

        Appellees/Cross-Appellants                  Decided:  October 17, 2014

* * * * *

D. Jeffery Rengel and Thomas R. Lucas, for appellants/cross-
appellees.

Robert J. Gilmer and Jeffrey M. Stopar, for appellees/cross-
appellants.

* * * * *

**JENSEN, J.**

{¶ 1} This matter is before the court upon cross-appeals filed by plaintiffs-

appellants/cross-appellees, John and Dawn Henderson ("the Hendersons"), and

defendants-appellees/cross-appellants, SMC Promotions, Inc. ("SMC Promotions"),

Specialty Merchandise Corp. ("SMC"), and eMerchantClub, LLC ("EMC") (referred to collectively as simply "defendants"). For the reasons that follow, we reverse the August 3, 2013 judgment of the Erie County Court of Common Pleas and remand for further proceedings.

## I. Factual Background

{¶ 2} SMC is an import distribution company headquartered in California. It distributes merchandise through independent individual distributors, referred to as "members," who pay a membership fee. In the summer of 2008, the Hendersons viewed an SMC infomercial, featuring actor Tom Bosley, which advertised an opportunity to earn money from home by selling merchandise on the Internet as an SMC member. The infomercial invited potential members to contact SMC to receive a free information packet.

{¶ 3} On June 12, 2008, amid financial woes, Mr. Henderson contacted SMC via telephone. He was provided information about SMC membership and its business plan. He was told that he would receive one-on-one business coaching for 60 days, instructional manuals, and suggested methods of sale. He was assured that he could cancel his membership within 30 days and receive a full refund. Mr. Henderson verbally agreed to purchase a membership for $264.95, which he charged to his MasterCard account. SMC claims that its representatives advise potential members that by purchasing a membership, they agree to be bound by SMC rules, which are both mailed

2.

to the member in a membership kit and are available on SMC's website. SMC's records show that the Hendersons' membership kit was delivered on June 18, 2008.

{¶ 4} As an SMC member, the Hendersons could purchase goods below the suggested retail price which they could then mark-up and re-sell. SMC provided supply catalogues, sales circulars, and brochures. On June 19, 2008, Mr. Henderson logged onto the eMerchantClub Gift Card Central Website, an e-commerce service offered by EMC, an affiliate of SMC. According to defendants, Mr. Henderson clicked to accept EMC's standard rules, then purchased a non-refundable gift card website package for $5,195. This included a special account credit of $4,450 which could be used to purchase SMC merchandise or other services.

{¶ 5} Both SMC's and EMC's rules contained provisions for cancellation, refunds, arbitration, and venue. SMC's pertinent rules provided as follows:

4. Cancellation. If you cancel your membership within 30 days of joining SMC, you may be eligible for a refund of your membership fees (excluding shipping and handling). Call toll-free 1-877-523-9088 for eligibility and cancellation instructions. If you cancel after 30 days, you will remain responsible for any remaining fees until paid in full.

9. Arbitration. Any controversy, dispute or claim of any nature whatsoever arising out of, in connection with or in relation to your SMC membership or these Rules, or involving you and SMC, including the issue or arbitrability of any such claims, will be resolved by binding arbitration

3.

before a retired judge at JAMS in Santa Monica, California. If you are not a resident of the United States, the UNCITRAL Arbitration Rules shall apply and JAMS will be the appointing authority. The prevailing party will be awarded all costs and expenses, including without limitation all arbitration, expert witness and attorney fees, costs and expenses.

10. California Law and Venue. Your membership is deemed to be entered into and performed in Santa Monica, California. These Rules shall be governed by and construed in accordance with the laws of the State of California without regard to conflicts of law provisions. You consent to exclusive personal jurisdiction and venue in Los Angeles County, California, and agree that it shall be the sole forum and venue for any and all disputes involving SMC, including without limitation small claims actions.

EMC's rules provided:

3. Fees.

All fees paid are non-refundable. * * *

4. Cancellation

You may cancel your membership, website or any other eMerchantClub services any time by notifying us in writing by confirmed email to cancel@emerchantclub.com, confirmed fax to 1-888-201-2680, or first-class, registered or certified mail, return receipt requested, addressed to

eMerchantClub, Attn: Website Cancellation, 996 Flower Glen Street, Simi Valley, California 93065.  Any incoming E-mail sent to canceled or terminated accounts will not be bounced back or forwarded to another account.  Everything regarding the website that is stored on our servers may be deleted.  Cancellation will not entitle you to refund or relieve you of your obligation to pay the remaining balance of your account.  However if you cancel within 30 days of purchasing an eMerchantClub website, we may apply the purchase price in the form of a merchandise credit to your SMC account.

18.  Arbitration

Any controversy, dispute or claim of any nature whatsoever arising out of, in connection with or in relation to your eMerchantClub membership, website or the Rules, or involving you and eMerchantClub or its affiliates, including the issue or arbitrability of any such disputes, will be resolved by binding arbitration in Santa Monica, California before a retired judge at JAMS in accordance with its rules.  If you are not a resident of the United States, the UNCITRAL Arbitration Rules will apply and JAMS will be the appointing authority.  The prevailing party will be awarded all costs and expenses, including arbitrator, expert witness and attorney fees, costs and expenses.

19. California Law

Your membership is deemed to be entered into and performed in Los Angeles, California. These rules will be governed by and construed in accordance with the laws of the State of California without regard to conflicts of law provisions. You consent to exclusive personal jurisdiction and venue in Los Angeles County California and agree that it will be the sole forum and venue for any and all disputes involving eMerchantClub.

{¶ 6} Shortly after becoming SMC members, the Hendersons experienced difficulty in connecting with their business coach. They decided to exercise their cancellation rights within the 30-day period and they provided the requisite notices. SMC refunded their membership fee as it was obligated to do under the rules. EMC would not, however, refund the $5,195 remitted by the Hendersons. It agreed only to issue the special account credit of $4,450 which could be used to purchase SMC merchandise.

{¶ 7} The Hendersons wrote letters demanding return of their money and they registered complaints with the Ohio and California attorneys general to no avail. In the meantime, they conducted Internet research through which they learned that others had fallen victim to defendants' "scheme."

6.

## II.  Procedural Background

### A.  The Hendersons' Complaint and the Defendants' Failure to Answer

{¶ 8} On July 8, 2009, the Hendersons filed a complaint against defendants in the Erie County Court of Common Pleas alleging violations of the Business Opportunity Purchasers Protection Act, R.C. Chapter 1334, et seq., violations of the Consumer Sales Practices Act, R.C. Chapter 1345, et seq., fraud, unjust enrichment, successor liability, and breach of contract.  Along with that complaint, the Hendersons served discovery requests, including requests for admission, requests for production of documents, and interrogatories.  Defendants failed to answer the complaint or to provide responses to discovery requests.

{¶ 9} In the discovery requests, the Hendersons sought admissions from defendants that they refused to refund money to them in the amount of $5,950;[1] that their refusal to refund the money was intentional and with knowledge that they were not entitled to retain the Hendersons' funds; that they did not provide EMC standard membership rules to the Hendersons; that all allegations in the Hendersons' complaint were true; and that the Hendersons had been damaged in the amount of $5 million in compensatory damages and $10 million in punitive damages.

{¶ 10} On September 2, 2009, the Hendersons moved to deem matters admitted due to defendants' failure to provide responses to requests for admission.  In a judgment entry dated September 9, 2009, the court expressed concern over (1) whether the

---

[1] It is unclear why the amount in the request was $5,950 as opposed to $5,195.

7.

Hendersons had served an electronic copy of the discovery requests, and (2) whether it was proper to establish damages through unanswered requests for admission. The court suggested that it would be more appropriate and customary to establish damages in a default judgment case by conducting a damages hearing. It ordered the Hendersons to file a supplemental memorandum with case law to support their request to establish the amount of damages by deeming admitted unanswered requests for admissions.

{¶ 11} As ordered, the Hendersons filed a supplemental brief confirming that they had served discovery requests via CD. As to the second issue, the Hendersons provided citation to authorities discussing the types of matters that are the proper subject of requests for admissions, including the 1976 staff notes to Civ.R. 36(A) (indicating that requests for admission may include statements of fact, opinions as to fact, and opinions as to the application of law to fact), and our decision in *Youseff v. Jones*, 77 Ohio App.3d 500, 509, 602 N.E.2d 1176 (6th Dist.1991) ("Regarding requests for admissions, it is irrelevant that the matters requested to be admitted are central to the case or must be proven by the requesting party at trial."). They also cited our decision in *C.J. Tower & Sons of Buffalo, Inc. v. D & H Machinery, Inc.,* 6th Dist. Lucas No. L-85-260, 1986 WL 4378 (Apr. 11, 1986), where we accepted unanswered requests as admitted which established the amount due and owing from defendant. The Hendersons also cited *State of Ohio-Ohio State University v. Cordell,* 10th Dist. Franklin No. 08AP-361, 2008-Ohio-6124, where the court found the amount owed by defendant was conclusively established by her failure to respond to requests for admission.

8.

{¶ 12} On October 9, 2009, the Hendersons moved for default judgment under Civ.R. 55(A).  They stated that the clerk of courts successfully served the complaint and discovery requests on July 20, 2009; defendants' deadline for answering was August 17, 2009; and defendants failed to file an answer.  They claimed that no hearing on damages was required because the defendants had effectively conceded compensatory damages of $5 million and punitive damages of $10 million by failing to answer requests for admission.

{¶ 13} The Hendersons satisfied the court that they had properly served discovery requests upon defendants, however, they did not convince the court that defendants' failure to respond to requests for admission entitled them to a damages award totaling $15 million without an evidentiary hearing to support such an award.  The court was not persuaded by the cases cited by the Hendersons and it remained concerned that defendants' due process rights would be infringed upon.  The court granted the Hendersons' motion for default judgment on November 16, 2009, and set the matter for an oral damages hearing on January 8, 2010.

## B.  The Damages Hearing

{¶ 14} The matter proceeded to hearing as scheduled in front of a magistrate.  The Hendersons both testified, as did Steven Miedema, a business broker with First National Business Corporation, whom the Hendersons retained to provide expert opinions concerning the calculation of damages.  At the hearing, they dismissed without prejudice their unjust enrichment and successor liability claims.

9.

**{¶ 15}** The magistrate issued a decision dated February 10, 2010, summarizing the facts and the applicable law. He found that the Hendersons purchased an SMC membership for $264.95 via credit card with the understanding that there was a 30-day money back guarantee. They were issued a password needed to establish a "pre-pay pal account." The account was required to be set up by website and was necessary to enable them to purchase goods from defendants to offer for sale. There was a $5,000 fee to set up the account. They paid $5,195 cash to defendants through two Western Union wire transfers on June 19, 2009 [sic].

**{¶ 16}** The magistrate found that there were various membership levels offered, and the Hendersons opted for the level that would enable them to offer defendants' entire catalog of goods for sale on their website. Included in their membership was free business coaching for the first 60 days. The Hendersons spoke with their assigned coach only once. When they were unable to reach him again, "red flags" went up, prompting them to cancel their membership within the 30-day window. They promptly returned four or five boxes of cards, brochures, and catalogs that defendants had shipped to them and they never ordered any merchandise. The magistrate concluded that they "effectively rescinded or canceled this venture without buying a single item."

**{¶ 17}** The magistrate recognized that after canceling, $264.95 was credited to the Hendersons' credit card account. Mrs. Henderson testified that someone at SMC told her that if everything was mailed back by July 31, 2008, the $5,195 they paid for the website would be refunded, however, defendants refused to refund the $5,195.

10.

{¶ 18} As to damages, Mr. Henderson testified that SMC's website boasted that a mother-daughter team had made $45,000 in sales in six months. He testified that he heard reports that people had made $400,000-$500,000 per year. He said that Travis Prouty, of SMC, told him that he could make $500,000 within 14 months if he bought defendants' entire catalog.

{¶ 19} Miedema, who evaluates open and active businesses and markets them for sale, rendered a number of opinions to assist in calculating damages. Assuming annual gross sales of $300,000 and $500,000, and using a 10-year earnings cycle, he opined that the fair market values of the business would be $1,339,117 and $2,268,555, respectively. He rendered no opinions as to whether sales of $300,000 and $500,000 were feasible estimates of how the Hendersons' business would have fared had they gone forward.

{¶ 20} In analyzing the Hendersons' claims, the magistrate found the Business Opportunity Protection Plan Act to be applicable. However, because this was a commercial venture, he found that it was not a "consumer transaction" to which the Consumer Sales Practices Act would apply. He recognized that R.C. 1345.09(A) [sic] of the Business Opportunity Plans Act[2] allows a purchaser to rescind an agreement and recover three times the amount of actual damages or $10,000, whichever is greater. The magistrate also noted that the damages available for fraud and breach of contract are those proximately resulting from the fraud or breach.

---

[2] The correct provision is R.C. 1334.09(A).

{¶ 21} Ultimately, the magistrate found that the Hendersons rescinded the transaction and that $5,195 was not properly refunded. Although he specifically found the Hendersons' and Miedema's testimony to be credible, he determined that the Hendersons were not entitled to damages for the loss of prospective or future business because those damages were speculative. Because the Hendersons had taken no action toward sales, he concluded that Miedema's calculations were predicated on assumptions that had no basis in reality and he characterized defendants' promotional materials estimating members' potential for success as mere "puffing" as opposed to fraudulent misrepresentation. The magistrate also articulated its struggle with using defendants' failure to answer requests for admissions as the basis for determining damages and found that it would be an "abdication of judicial responsibility" to do so.

{¶ 22} The magistrate determined that the Hendersons' actual damages were $5,195 and awarded three times that amount for the violation of the Business Opportunity Plan Act. He concluded that defendants' refusal to return the Hendersons' money, despite representing that there was a 30-day money back guarantee, constituted a conscious disregard for their known rights that had great probability of causing substantial harm. He found defendants' conduct to be fraudulent, giving rise to a punitive damages award. He doubled the amount of actual damages for an award of $10,390. He

summarized the total award as $31,070 [sic].[3]  He also awarded attorneys fees and ordered the Hendersons' attorney to submit an itemized fee bill.

{¶ 23} The Hendersons' counsel submitted documentation of attorneys fees, costs, and expenses totaling $46,862.76.  He later filed a supplemental brief requesting a lodestar multiplier enhancement for an award of $90,800, plus court costs and expenses of $1,462.76.

### C.  The Hendersons' Objections to the Magistrate's Decision

{¶ 24} On February 23, 2010, the Hendersons filed objections to the magistrate's decision, challenging his conclusions that (1) the Consumer Sales Protection Act was not applicable; (2) defendants' representations were mere "puffing"; (3) it was not appropriate to determine damages by way of unanswered requests for admission; and (4) they were entitled to no damages for breach of contract.  They also argued that the magistrate had miscalculated damages.  The Hendersons ultimately withdrew the first and fourth objections.

{¶ 25} The Hendersons argued that Ohio courts had adopted an expectational analysis or "benefit of the bargain" rule in determining whether future lost profits are too speculative.  They contended that the magistrate was required to look at their expectations rather than defendants' actions.  They urged that proof of the amount of damages rises above mere speculation when they are calculated by "some fairly definite

---

[3] Three times $5,195 equals $15,585.  Added to the actual damages of $5,195, that would equal $20,780 for a total, including punitive damages, of $31,170.

standards such as market value, established experience, or direct inference from known circumstances." They insisted that their expert's calculations comported with these standards, especially given the magistrate's explicit determination that Miedema's testimony was credible.

{¶ 26} The Hendersons also continued to argue that defendants had effectively admitted damages by failing to respond to requests for admission. They contended that by failing to deem those requests admitted, the magistrate improperly considered facts not in evidence, actively protected the defendants, and advocated positions and defenses not put forth by any party.

{¶ 27} Finally, the Hendersons claimed that the magistrate's decision was ambiguous and that damages had been miscalculated. They interpreted that the magistrate intended to award $20,680 in compensatory fraud damages, $10,390 in punitive fraud damages, and $15,585 for violation of R.C. Chapter 1334. This would total $46,655.

{¶ 28} On September 26, 2012, the court issued judgment entries on the Hendersons' objections to the magistrate's decision and their request for attorneys fees. The trial court's judgment entry recited the magistrate's findings and addressed the three objections that the Hendersons did not withdraw.

{¶ 29} With respect to the Hendersons' objection concerning the failure to award future earnings, the trial court concluded that there were many variables which made the measure of damages speculative. The court agreed with the magistrate that defendants'

14.

advertisements of potential profits constituted mere puffing. It observed that the Hendersons quickly "smelled a rat" and tried to get out of the situation as soon as they could.

{¶ 30} With respect to the magistrate's refusal to accept defendants' unanswered requests for admissions as evidence of damages, the court indicated that it had extensively researched the issue and found the cases cited by the Hendersons to be inapplicable. The court concluded that it was within its discretion to decide whether a hearing on damages was necessary. It suggested that to do otherwise would have subverted justice and violated the defendants' due process rights.

{¶ 31} Finally, as to the Hendersons' claim that the magistrate had miscalculated damages, the court agreed with the Hendersons that there was ambiguity in the magistrate's ruling which required clarification. It noted that the Hendersons did not challenge the punitive damages award, thus it left it at $10,390, as stated in the magistrate's decision. It found that the Hendersons' actual damages were $5,195. Under R.C. 1334.09(A), the Hendersons were entitled to three times the amount of actual damages or $10,000, whichever is greater. It, therefore, awarded $15,585 for damages under the Business Opportunity Plan Act. The court awarded an additional $5,195 as damages for the fraud claim. This resulted in a total award of $31,170. It awarded attorneys fees of $74,150. It affirmed and modified the magistrate's decision consistent with the rulings described in the September 26, 2012 judgment entry.

15.

**{¶ 32}** The Hendersons appealed the court's September 26, 2012 judgment entry. Their assignments of error related to the court's refusal to deem admitted the unanswered requests for admission as they concerned the amount of damages, its decision to ignore the Hendersons' unopposed expert witness's damages calculation, and the overall amount of damages as calculated by the court. They filed their brief in this court on January 22, 2013.

### D.  Defendants' Motion to Vacate Judgment

**{¶ 33}** On February 20, 2013, defendants appeared for the first time and requested an extension of time by which to file an appellee brief. On March 18, 2013, they filed a motion to remand the matter to the trial court so that they could move to vacate the judgment for lack of personal jurisdiction, and they filed the motion to vacate in the common pleas court the same day. Despite the Hendersons' objections, we granted defendants' motion.

**{¶ 34}** In their motion to vacate, defendants observed that the Hendersons had failed to attach to their complaint the SMC and EMC standard membership rules, both of which contained forum selection clauses and provided for mandatory arbitration. They argued that the judgment entries were void and must be set aside because the court lacked personal jurisdiction over them pursuant to the exclusive forum selection clause.

**{¶ 35}** The Hendersons opposed the motion to vacate. They argued that the court had acquired personal jurisdiction over the defendants because service of process was successfully accomplished. They also argued that the membership agreements were

16.

invalid and unenforceable because (1) defendants failed to offer any evidence that the Hendersons had knowingly agreed to the terms; (2) the forum selection clause was the result of fraud or overreaching, was contrary to Ohio public policy, had not been negotiated, and would limit litigation to a jurisdiction so inconvenient as to be unreasonable; (3) the magistrate awarded nothing for breach of contract and found that they had rescinded the agreement; (4) defendants were barred by laches, waiver, and estoppel from asserting the forum selection and arbitration clauses because they waited over three years to assert them; and (5) the terms of the agreements were procedurally and substantively unconscionable given, inter alia, the Hendersons' relative lack of sophistication, defendants' failure to explain the terms, the financial stress they were experiencing, the commercial unreasonableness of the terms, and the inconvenience of the forum.

{¶ 36} While they acknowledged defendants' claim that Mr. Henderson accepted the terms by clicking a button to proceed to the EMC website, the Hendersons contended that this did not demonstrate a true meeting of the minds and that defendants' affidavit spoke in generalities and not to any specific evidence that the Hendersons had agreed to their rules. They also insisted that because defendants, in their opening brief, had not challenged jurisdiction on the basis of Ohio's long-arm statute or on due process grounds, they had effectively conceded the court's jurisdiction without the need for the trial court to undertake such an analysis.

17.

**{¶ 37}** Defendants replied. They clarified that although their initial focus was on the forum selection clause, they were, in fact, challenging the court's judgment for lack of personal jurisdiction. They submitted an additional affidavit from SMC employee, Scott Palladino, articulating pertinent facts to defeat jurisdiction under Ohio's long-arm statute and on due process grounds. They argued that because the court lacked personal jurisdiction, they had no obligation to appear to raise the defense of lack of personal jurisdiction or to assert the arbitration provisions. They could instead collaterally attack the judgment in California based on the judgment being void in the first place.

**{¶ 38}** Defendants complained that the Hendersons were trying to selectively enforce one provision of the agreements (the cancellation provisions), while avoiding other provisions. They cited case law indicating that even if the Hendersons had been induced to enter into the agreement by fraud, deceit, or misrepresentation, it would not affect the validity of the forum selection clause. They urged that the Hendersons' relative lack of sophistication was an insufficient basis to invalidate the forum selection clause. And they argued that the inconvenience of the location of the forum did not render the provision so unreasonable or unjust as to invalidate the clause.

**{¶ 39}** On August 2, 2013, the trial court denied defendants' motion to vacate. It remarked that it was unaware of the forum selection clauses due to the Hendersons' failure to attach the rules to their complaint. But the court found that the Hendersons agreed to the rules based on the affidavits from defendants' representative indicating that every prospective member was advised that by joining, they were agreeing to be bound

18.

by SMC rules. It found that the Hendersons agreed to the EMC rules by logging in and clicking through to the website.

{¶ 40} The court stated that discussion and argument about whether the court has long-arm jurisdiction was immaterial and irrelevant in considering the validity of a forum selection clause in what it deemed was a commercial contract. It indicated that there was insufficient information before it to make such a determination. It agreed with defendants that they were not barred from challenging the validity of the judgment because if the court lacked personal jurisdiction over defendants, the judgment would be void.

{¶ 41} The court also found the Hendersons' argument that the contract was rescinded to be without merit because they had accepted the benefits and sued for breach of the contract. It found the discussion relative to arbitration to be immaterial given the procedural posture of the case. And it recognized that the burden of demonstrating unenforceability of a forum selection clause falls on the party challenging its validity, thus the Hendersons bore the burden.

{¶ 42} The court acknowledged that forum selection clauses in commercial contracts should generally control as long as both parties are commercial entities, there was no fraud or overreaching, and enforcement of the clause would not be unreasonable or unjust. The court found that this was a commercial contract between business entities, regardless of the fact that one party was more sophisticated than the other. It found that the forum selection clause was part of the transaction and that it did not matter that the

19.

Hendersons lacked sophistication, were relatively inexperienced, lacked legal knowledge, and were unfamiliar with the terms. It explained that a claim of fraud must relate directly to the negotiation or acceptance of the forum selection clause. It found that there was no evidence that the clause was the product of fraud and there was no public policy that would be violated by enforcement of the clause.

{¶ 43} Turning to whether the clause was unreasonable or unjust, the court recognized that the test is whether under the circumstances of the case, enforcement would result in litigation so unreasonably difficult and inconvenient that plaintiff would for all practical purposes be deprived of his day in court. It addressed the factors to be considered including which law controls the dispute, what residency the parties maintain, where the contract will be executed, where the witnesses and parties are located, and whether the forum's designated location is inconvenient. The court noted that it is rare for consideration of these factors to result in overriding the forum agreed to by the parties.

{¶ 44} The court acknowledged that at first blush, it would appear that the Hendersons were unable to meet the high hurdle of showing that litigating the case in California would effectively deprive them of their day in court. However, it explained, there were unrefuted facts that persuaded the court that the forum clause would do just that.

{¶ 45} Henderson attested that he was unemployed in 2008 and would not have been able to afford to travel to California to dispute any claim with defendants. He made

20.

clear that he was so desperate to make this concept work that he withdrew most of his retirement savings to pay defendants. The court indicated that it could find no cases where the party seeking to avoid the forum selection clause argued that he or she could not afford to travel to California, that there was a period of unemployment, and that most of his or her retirement savings had been expended in transacting with the opposing party. It concluded that the financial inability of the Hendersons to travel to California would indeed deprive them of their day in court and on the unique facts of this particular case, it found that enforcement of the forum selection clause compelling plaintiff to litigate in California was unreasonable or unjust.

### E. The Parties Cross-Appeal

{¶ 46} Following the trial court's judgment on the motion to vacate, we reinstated the case to our docket on September 4, 2013. The parties filed cross-appeals.

{¶ 47} The Hendersons filed a supplemental brief on December 13, 2013, this time assigning the following errors for our review with respect to the trial court's September 26, 2012 and August 2, 2013 judgments:

I. THE TRIAL COURT ERRED WHEN IT FAILED TO DEEM ADMITTED PROPERLY SERVED REQUESTS FOR ADMISSION TO WHICH APPELLEES NEVER RESPONDED[.]

II. THE TRIAL COURT ERRED WHEN IT FAILED TO CONSIDER THE UNOPPOSED EXPERT TESTIMONY ON THE

21.

AMOUNT OF APPELLANTS' DAMAGES SUFFERED AT THE

HANDS OF APPELLEES[.]

III. THE TRIAL COURT ERRED IN ITS AUGUST 2, 2013

JUDGMENT FINDING THAT APPELLANTS/CROSS APPELLEES DID

NOT RESCIND THE CONTRACT AND AGREED WITH ITS "RULES"

CONTAINING A FORUM SELECTION CLAUSE[.]

{¶ 48} The assignments of error identified in defendants' cross-appeal relate to the trial court's August 2, 2013 judgment refusing to enforce the forum selection and arbitration clauses:

1. The Trial Court erred by failing to determine whether it had personal jurisdiction over defendants.

2. The Trial Court erred by refusing to enforce the parties' agreement to resolve any dispute through binding arbitration.

3. The Trial Court erred by refusing to enforce the California forum selection clause contained within the parties agreement.

### III. Law and Analysis

{¶ 49} We begin by addressing the defendants' first assignment of error relating to the trial court's exercise of personal jurisdiction over them. "Personal jurisdiction is a question of law that appellate courts review de novo." *Kauffman Racing Equip., L.L.C. v. Roberts*, 126 Ohio St. 3d 81, 2010-Ohio-2551, 930 N.E.2d 784, ¶ 27. In its decision, the trial court deemed that "discussion and argument about whether Ohio and this Court has

'long arm jurisdiction' of Defendants [is] immaterial and irrelevant." Defendants claim that this was error. They contend that the trial court was required to determine whether personal jurisdiction was proper before addressing whether the forum selection or arbitration clauses in the parties' agreement were enforceable.

{¶ 50} Generally, a court must undertake a two-step process in determining whether a state court has personal jurisdiction over a non-resident defendant. *Fraley v. Estate of Oeding,* 138 Ohio St.3d 250, 2014-Ohio-452, 6 N.E.3d 9, ¶ 12**.** The court must first consider whether Ohio's long-arm statute, R.C. 2307.382, or the civil rules confer jurisdiction. *Id.* If they do, the court must then consider whether asserting jurisdiction over the non-resident defendant would deprive the defendant of the right to due process under the law, as guaranteed by the Fourteenth Amendment to the U.S. Constitution. *Id*. To satisfy due process, the defendant must maintain "certain minimum contacts with the state so that the suit does not offend traditional notions of fair play and substantial justice." *Clark v. Connor,* 82 Ohio St.3d 309, 314, 695 N.E.2d 751 (1998).

{¶ 51} The trial court bypassed this analysis, focusing instead on whether the parties' agreement contained a valid and enforceable forum selection clause. Relying on the Ohio Supreme Court's opinion in *Kennecorp Mtge. Brokers, Inc. v. Country Club Convalescent Hosp., Inc.,* 66 Ohio St.3d 173, 175, 610 N.E.2d 987 (1993), it reasoned that "a minimum contacts analysis * * * is not appropriate in determining the validity of Forum Selection clauses in commercial contracts." It adduced that we had remanded the case for it to decide only the motion to vacate, implying that this did not include a

23.

personal jurisdiction analysis, and that the record before it was insufficient to make such a determination.

{¶ 52} In *Kennecorp,* commercial parties entered into a multi-million dollar financing arrangement. Under the express terms of the parties' agreement, the parties agreed that Ohio law would control and that jurisdiction would lie with Ohio courts. Plaintiff, an Ohio corporation, filed suit in Ohio against the defendants, both California residents. Despite the forum selection clause in their agreement, defendants moved for dismissal for lack of personal jurisdiction. The trial court granted the defendants' motion, but we reversed, concluding that the forum selection clause was enforceable. *Kennecorp Mtge. Brokers, Inc. v. Country Club Convalescent Hosp., Inc.,* 6th Dist. Lucas No. L-91-157, 1992 WL 32032 (Feb. 21, 1992). The Supreme Court affirmed our decision. It recognized that "the requirement that a court have personal jurisdiction over a party is a waivable right and there are a variety of legal arrangements whereby litigants may consent to the personal jurisdiction of a particular court system." *Kennecorp* at 175. It observed that a forum selection clause in a commercial contract should control, absent a strong showing that it should be set aside. *Id.* It ultimately held that "absent evidence of fraud or overreaching, a forum selection clause contained in a commercial contract between business entities is valid and enforceable, unless it can be clearly shown that enforcement of the clause would be unreasonable and unjust." *Id.* at 176.

{¶ 53} In the present case, the trial court considered the three *Kennecorp* requirements. It found that the parties' dispute concerned a commercial transaction and

24.

that there was no evidence of fraud or overreaching in connection with the forum selection clause. It concluded, however, that enforcement of the clause would be unreasonable or unjust given Mr. Henderson's unemployment and the Hendersons' financial inability to travel to California to litigate the case. It denied defendants' motion to vacate.

{¶ 54} Although it is proper to apply the *Kennecorp* factors in considering whether a forum selection clause is enforceable, *Kennecorp* cannot be relied upon in this case as authority for dispensing with the two-step process for determining personal jurisdiction. This is because in *Kennecorp,* the forum selection clause provided for jurisdiction over the non-resident defendants in *Ohio.* The forum selection clause in this case provides for jurisdiction in *California.* The *Kennecorp* defendants had already waived due process and consented to the jurisdiction of the Ohio courts. The defendants here have not. Thus, if personal jurisdiction is lacking under the two-part analysis, the court would be prevented from proceeding to exercise jurisdiction over defendants. By considering the enforceability of the forum selection clause without first conducting the two-step personal jurisdiction analysis, the trial court effectively put the cart before the horse.

{¶ 55} To this end, we must also observe that even if the court had not erred by considering the enforceability of the forum clause before determining personal jurisdiction, it was still necessary to perform the due process analysis. The effect of finding the forum selection clause unenforceable was merely to remove the requirement

25.

that suit be filed exclusively in California. The effect was not to automatically vest Ohio with personal jurisdiction over defendants.

{¶ 56} Finally, we acknowledge defendants' contention that the trial court's decision refusing to enforce the California forum selection clause is inconsistent with *Salehpour v. Just a Buck Licensing, Inc.,* 12th Dist. Warren No. CA2013-03-028, 2013-Ohio-4436 (holding that mere distance, expense, and hardship are insufficient to render forum selection clause unreasonable), as well as numerous federal court cases. However, we conclude that the issue that must first be resolved is whether the court has personal jurisdiction. The Hendersons have the burden to establish the court's jurisdiction. *Dahlhausen v. Aldred*, 187 Ohio App.3d 536, 2010-Ohio-2172, 932 N.E.2d 949, ¶ 21 (12th Dist.). We, therefore, remand this matter to the trial court for determination of whether personal jurisdiction may properly be asserted over defendants. *See generally State ex rel. DeWine v. 9150 Group, L.P.,* 2012-Ohio-3339, 977 N.E.2d 112, ¶ 27 (9th Dist.) (remanding to trial court for determination of personal jurisdiction).

{¶ 57} We find defendants' first assignment of error well-taken. Given this conclusion, it is unnecessary to consider the remaining assignments of error at this time.

### IV. Conclusion

{¶ 58} We find that the trial court was required to determine whether defendants were subject to the personal jurisdiction of the Ohio courts. We, therefore, find defendants' first assignment of error well-taken, reverse the August 3, 2013 judgment of the Erie County Court of Common Pleas, and remand this matter to the trial court for

26.

application of the two-step personal jurisdiction analysis. Our disposition of this assignment of error obviates the need to address the remaining assignments of error at this time. The costs of this appeal are assigned to the Hendersons pursuant to App.R. 24.

Judgment reversed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Arlene Singer, J.                            _____
JUDGE

Thomas J. Osowik, J.

                                                                     _____
James D. Jensen, J.                                  JUDGE
CONCUR.

                                                                      _____
JUDGE

> This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at:
> http://www.sconet.state.oh.us/rod/newpdf/?source=6.