[Cite as *Henderson v. SMC Prods., Inc.*, 2019-Ohio-5275.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
ERIE COUNTY

| | |
|---|---|
| John Henderson, et al. | Court of Appeals No. E-18-003 |
| Appellants | Trial Court No. 2009-CV-0576 |
| v. | |
| SMC Productions, Inc., et al. | **DECISION AND JUDGMENT** |
| Appellees | Decided: December 20, 2019 |

* * * * *

D. Jeffery Rengel and Thomas R. Lucas, for appellants.

Jeffrey M. Stopar, for appellees.

* * * * *

**OSOWIK, J.**

{¶ 1} This is an appeal from a judgment of the Erie County Court of Common Pleas which granted appellees' motion to vacate default judgment for lack of personal jurisdiction. For the reasons set forth below, this court affirms the judgment of the trial court.

**{¶ 2}** This litigation began in 2009, and we explained its lengthy procedural history in *Henderson v. SMC Promotions, Inc.*, 6th Dist. Erie Nos. E-12-068, E-13-047, 2014-Ohio-4634. Briefly, in 2008 appellants, John and Dawn Henderson, a married couple living in Erie County, Ohio, entered into a business arrangement or enterprise (used interchangeably by the trial court) with California-based appellees, SMC Promotions, Inc. ("SMC Promotions"), Specialty Merchandise Corp. ("SMC"), and eMerchantClub, LLC ("EMC"). The business failed to launch within 30 days, and appellants commenced this litigation in Ohio on July 8, 2009. The trial court granted appellants' motion for default judgment on November 16, 2009, and awarded damages and attorney fees on September 26, 2012. Appellees finally appeared in the litigation on March 18, 2013, by filing a common law motion to vacate the default judgment for lack of personal jurisdiction. On August 2, 2013, the trial court denied the motion.

**{¶ 3}** Both parties appealed that decision. On October 17, 2014, this court remanded the matter for the trial court to conduct a two-step analysis pursuant to *Fraley v. Estate of Oeding*, 138 Ohio St.3d 250, 2014-Ohio-452, 6 N.E.3d 9, to determine whether appellees were subject to the personal jurisdiction of the Ohio courts. That process took over three years for the trial court to complete. On December 20, 2017, the trial court granted appellees' March 18, 2013 motion.

**{¶ 4}** Appellants filed this appeal setting forth four assignments of error:

I. The trial court erred in determining that it lacked personal jurisdiction over defendants-appellees.

2.

II. The trial court erred in reversing, on remand, its prior decision to not enforce California form selection and arbitration clauses contained in an on-line document where no evidence exists that appellants ever agreed to its terms.

III. The trial court erred when it failed to deem admitted properly served requests for admission to which appellees never responded.

IV. The trial court erred when it failed to consider the unopposed testimony on the amount of appellants' damages suffered at the hands of appellees.

{¶ 5} We will review the first and second assignments of error together.

{¶ 6} In support of their first assignment of error, appellants argue the trial court had personal jurisdiction over the appellees and erroneously conducted its two-step analysis. Appellants argue the trial court had general personal jurisdiction because of the nature and types of appellees' contacts in Ohio and had specific personal jurisdiction because of the facts in this case. In response, appellees argue the trial court correctly determined that it lacked personal jurisdiction.

{¶ 7} "'Jurisdiction' means 'the courts' statutory or constitutional power to adjudicate the case.' The term encompasses jurisdiction over the subject matter and over the person. * * * 'If a court acts without jurisdiction, then any proclamation by that court is void.'" (Citations omitted.) *Pratts v. Hurley*, 102 Ohio St.3d 81, 2004-Ohio-1980, 806 N.E.2d 992, ¶ 11. Personal jurisdiction is rudimentary for a court to render a valid

3.

judgment over a defendant. *Maryhew v. Yova*, 11 Ohio St.3d 154, 156, 464 N.E.2d 538 (1984). "This may be acquired either by service of process upon the defendant, the voluntary appearance and submission of the defendant or his legal representative, or by certain acts of the defendant or his legal representative which constitute an involuntary submission to the jurisdiction of the court." *Id.*

{¶ 8} We review the trial court's decision on personal jurisdiction de novo as a question of law. *Fraley*, 138 Ohio St.3d 250, 2014-Ohio-452, 6 N.E.3d 9, at ¶ 11, citing *Kauffman Racing Equip., L.L.C. v. Roberts*, 126 Ohio St.3d 81, 2010-Ohio-2551, 930 N.E.2d 784, ¶ 27.

> The determination whether an Ohio trial court has personal jurisdiction over an out-of-state defendant requires a two-step inquiry. First, the court must determine whether the defendant's conduct falls within Ohio's long-arm statute or the applicable civil rule. If it does, then the court must consider whether the assertion of jurisdiction over the nonresident defendant would deprive the defendant of due process of law under the Fourteenth Amendment to the United States Constitution.

*Id.* at ¶ 12, citing *Kentucky Oaks Mall Co. v. Mitchell's Formal Wear, Inc.*, 53 Ohio St.3d 73, 75, 559 N.E.2d 477 (1990).

{¶ 9} Appellants have the burden to establish the trial court's personal jurisdiction. *Henderson*, 6th Dist. Erie Nos. E-12-068, E-13-047, 2014-Ohio-4634, at ¶ 56; *Klunk v. Hocking Valley Ry. Co.*, 74 Ohio St. 125, 135, 77 N.E. 752 (1906) (at all times the burden

4.

of proof remains on the party whose case requires the proof of the fact at issue.). "'Once a defendant has challenged the trial court's personal jurisdiction over him or her, the plaintiff bears the burden of proving jurisdiction by a preponderance of the evidence.'" (Citation omitted.) *State ex rel. DeWine v. 9150 Group, L.P.*, 2012-Ohio-3339, 977 N.E.2d 112, ¶ 8 (9th Dist.). "[P]reponderance of evidence means the greater weight of evidence. * * * The greater weight may be infinitesimal, and it is only necessary that it be sufficient to destroy the equilibrium." *Travelers' Ins. Co. v. Gath*, 118 Ohio St. 257, 261, 160 N.E. 710 (1928). Preponderance is a higher burden of proof than prima facie, which merely means "at first view" appearing sufficient to establish the fact unless rebutted. *Carr v. Howard*, 17 Ohio App.2d 233, 235, 246 N.E.2d 563 (2d Dist.1969).

{¶ 10} The trial court's decision on personal jurisdiction arose from appellees' March 18, 2013 common law motion to vacate the November 16, 2009 default judgment, which is the proper method to challenge a void judgment. *Romp v. Jean-Pierre*, 6th Dist. Lucas No. L-15-1123, 2016-Ohio-5072, ¶ 14. "The authority to vacate a void judgment is not derived from Civ.R. 60(B) but rather constitutes an inherent power possessed by Ohio courts." *Patton v. Diemer*, 35 Ohio St.3d 68, 518 N.E.2d 941 (1988), paragraph four of the syllabus.

{¶ 11} The grant or denial of a common law motion to vacate a void judgment is reviewed for an abuse of discretion. *Terwoord v. Harrison*, 10 Ohio St.2d 170, 171, 226 N.E.2d 111 (1967). Abuse of discretion "'connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable.'"

5.

*Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983), quoting *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

{¶ 12} The trial court did not conduct a separate oral evidentiary hearing on the common law motion to vacate default judgment for lack of personal jurisdiction, instead relying on the entire record, including, without limitation, the January 8, 2010 evidentiary hearing on damages. It was within the trial court's discretion whether to conduct an evidentiary hearing. *See T.S. Expediting Services, Inc. v. Mexican Industries, Inc.*, 6th Dist. Wood No. WD-01-060, 2002-Ohio-2268, ¶ 26, fn. ix. Even if the trial court was required to hold a hearing specifically on the motion, the record shows the trial court held a "hearing." A "hearing may be limited to a review of the record, or, at the judge's discretion, the hearing may involve the acceptance of briefs, oral argument and/or newly discovered evidence." *Ohio Motor Vehicle Dealers Bd. v. Cent. Cadillac Co.*, 14 Ohio St.3d 64, 67, 471 N.E.2d 488 (1984).

{¶ 13} We will not reverse the trial court's findings of fact absent an abuse of discretion, nor will we make a finding of fact the trial court should have made nor extract a finding where no such finding was made. *In re Guardianship of Rudy*, 65 Ohio St.3d 394, 396, 604 N.E.2d 736 (1992).

### A. R.C. 2307.382 and Civ.R. 4.3(A)

{¶ 14} Our first step in the two-step analysis of personal jurisdiction over a nonresident defendant is to determine if appellees' conduct falls within R.C. 2307.382 or Civ.R. 4.3(A). *Fraley*, 138 Ohio St.3d 250, 2014-Ohio-452, 6 N.E.3d 9, at ¶ 13. R.C.

6.

2307.382(A)(1) and Civ.R. 4.3(A) complement each other. "R.C. 2307.382(A)(1) authorizes a court to exercise personal jurisdiction over a nonresident defendant, whereas Civ.R. 4.3(A)(1) provides for service of process to effectuate that jurisdiction. Both require that the nonresident defendant be 'transacting any business' in Ohio." *Kentucky Oaks*, 53 Ohio St.3d at 75, 559 N.E.2d 477. "[T]o the extent that R.C. 2307.382(A) and Civ.R. 4.3(A) conflict, Civ.R. 4.3(A) controls." *Fraiberg v. Cuyahoga Cty. Court of Common Pleas, Domestic Relations Div.*, 76 Ohio St.3d 374, 376, 667 N.E.2d 1189 (1996).

{¶ 15} Only one factor under Civ.R. 4.3(A) or R.C. 2307.382(A) is required to be determined by the court for the first part of the two-part test. *CompuServe, Inc. v. Trionfo*, 91 Ohio App.3d 157, 162, 631 N.E.2d 1120 (10th Dist.1993); *Conn v. Zakharov*, 667 F.3d 705, 713 (6th Cir.2012).

{¶ 16} R.C. 2307.382(A)(1) states, "A court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a cause of action arising from the person's * * * Transacting any business in this state." "For purposes of R.C. 2307.382, 'person' includes 'an individual, his executor, administrator, or other personal representative, or a corporation, partnership, association, or any other legal or commercial entity, who is a nonresident of this state.'" *Fraley* at ¶ 13, quoting R.C. 2307.381. R.C. 2307.382 is considered a procedural or remedial statute because it "prescribes the methods of enforcement of rights or obtaining redress" as opposed to a

7.

substantive law statute that "creates duties, rights and obligations." *Kilbreath v. Rudy*, 16 Ohio St.2d 70, 72, 242 N.E.2d 658 (1968).

{¶ 17} We find "Civ.R. 4.3(A) defines 'person' in terms nearly identical to R.C. 2307.381." *Fraley* at ¶ 14. Civ.R. 4.3(A)(1) states:

> When Service Permitted. Service of process may be made outside of this state, as provided in this rule, in any action in this state, upon a person who, at the time of service of process, is a nonresident of this state or is a resident of this state who is absent from this state. "Person" includes an individual, an individual's executor, administrator, or other personal representative, or a corporation, partnership, association, or any other legal or commercial entity, who, acting directly or by an agent, has caused an event to occur out of which the claim that is the subject of the complaint arose, from the person's * * * Transacting any business in this state.

{¶ 18} The trial court's judgment entry evaluated the record in light of Civ.R. 4.3(A), R.C. 2307.382(A)(1)-(4) and (6), and R.C. 2307.382(B). The trial court then concluded that appellants successfully showed R.C. 2307.382(A)(1) applied.

{¶ 19} The Ohio Supreme Court guides us to interpret "transacting any business in Ohio" under R.C. 2307.382(A)(1) and Civ.R. 4.3(A)(1) where the meaning of "transact" includes "to have dealings" and embraces in its meaning the carrying on or the prosecution of business negotiations that is broader than the word "contract" and may involve business negotiations which have been either wholly or partly brought to a

8.

conclusion. *Kentucky Oaks*, 53 Ohio St.3d at 75, 559 N.E.2d 477; *Goldstein v. Christiansen*, 70 Ohio St.3d 232, 236, 638 N.E.2d 541 (1994), citing *U.S. Sprint Communications Co. Partnership v. Mr. K's Foods, Inc.*, 68 Ohio St.3d 181, 185, 624 N.E.2d 1048 (1994) (the broad terms cannot be defined in a generalized manner and rely on the particular facts of a case).

{¶ 20} An Ohio court reviews all relevant factors in its determination of "transacting any business in Ohio," including, without limitation, where and by whom the business dealings were initiated, how much of the negotiations occurred in Ohio, and whether the agreement obligates the non-resident defendant to make payments or owe other obligations to an Ohio business. *Ohlman Farm & Greenhouse, Inc. v. Kanakry*, 6th Dist. Lucas No. L-13-1264, 2014-Ohio-4731, ¶ 22. Another factor for review could be whether the agreement orders the majority of the work to be performed in Ohio. *Lucas v. P & L Paris Corp.*, 7th Dist. Mahoning No. 11-MA-104, 2012-Ohio-4357. We are mindful that "the mere solicitation of business does not constitute 'transacting business.' Furthermore, physical presence within the state is not necessary. * * * The determination of when internet use constitutes 'transacting business' depends upon the type of internet activity involved." (Citations omitted.) *Ashton Park Apts., Ltd. v. Carlton-Naumann Constr., Inc.*, 6th Dist. Lucas No. L-08-1395, 2009-Ohio-6335, ¶ 15.

{¶ 21} The trial court made a number of findings of fact from the record that SMC "transacted business in Ohio" for the first step in the personal jurisdiction analysis. However, the trial court concluded it did not have personal jurisdiction over SMC

9.

Promotions and EMC. The record contains the pleadings and supporting documents, including affidavits from fact witnesses. The record also contains the transcript of the January 8, 2010 damages hearing before the trial court's magistrate when each appellant and appellants' business broker expert testified and exhibits were admitted.

{¶ 22} First, the trial court found appellees entirely operated their businesses from California. Appellees have no office or agents in Ohio, own no property in Ohio, send no representatives to Ohio, and have no statutory agent in Ohio. We reviewed the record and do not find the trial court abused its discretion in reaching this finding.

{¶ 23} Mrs. Henderson testified at the January 8, 2010 hearing she was aware of seeking relief in the state of California because at one time she filed a complaint with the California attorney general about SMC not refunding all of their money. The record also contains two affidavits, dated March 16 and June 27, 2013, respectively, by Scott Palladino, the Chief Financial Officer of SMC, which by then had changed its name to Smart Living Company. Through his unrebutted affidavits, Mr. Palladino averred SMC is a California corporation and has been headquartered in California since 1954. None of SMC's employees, shareholders, officers or directors reside in Ohio; SMC has no property, office, telephone listing, or post office box in Ohio. SMC does not have any relationship with any bank or financial institution in Ohio, and "No payment from Mr. Henderson was accepted by SMC in the State of Ohio. * * * At no time has SMC shipped any SMC goods to Mr. Henderson for re-sale in the State of Ohio. * * * SMC engages in

10.

national advertising and has never directly targeted the State of Ohio with its advertising and/or internet website."

{¶ 24} Second, the trial court found SMC did more than merely solicit business in Ohio by infomercials. SMC is "an import distribution company, which distributed merchandise to independent, individual distributors ('members'), who pay a membership fee." SMC's "intent and purpose of a national television infomercial was to establish paid memberships whereby other parties (members) would purchase distributed goods and re-sell them. This set-up was designed to be a continuing business endeavor intended to benefit both parties." We reviewed the record and do not find the trial court abused its discretion in reaching this finding.

{¶ 25} Mr. Henderson testified that he and his wife were Ohio residents in 2008 when they saw the SMC infomercial on television at a time when they were both unemployed and looking for work. "And because I was in the retail business, my wife's got a bachelor's degree in business, we decided we could maybe put ourselves to work and take care of our family by selling and we thought this looked like a good idea." Mr. Henderson understood the infomercial was an advertisement: "Well, it was an ad, an infomercial, and they had Tom Bosley on there, and I, I grew up with Tom Bosley, and I trusted that." Mr. Henderson testified that after conferring with his wife, he called SMC: "Well, they sort of tell you what it's going to cost for membership, and it wasn't very much, and they were polite on the phone at that time and they explained a few things. * * * [T]hey were going to send us a package of information, and we did receive that."

11.

Mr. Henderson also went to SMC's website: "And this, this was on their website with Tom Bosley * * * saying make big profits by selling products, it's easy, * * *." Mr. Henderson received and read the large package of information: "I did find where it said that you could get your money back within 30 days, and so we thought it was safe, and then with Tom Bosley, you know, that advertises this, or his picture is on this information, we thought it would be a good thing to do."

{¶ 26} He also testified how the business arrangement worked as an SMC member:

Court: Tell me how this was supposed to work. Were you, were you supposed to buy their materials online and then you were going to resell them? Is that how this would work?

A: Correct.

Court: Okay, okay. So * * * they had a storehouse of merchandise where you could go online and order the materials and then it would be –

A: Shipped to either the customer or to us.

Court: So you could go either way. You could either ship it directly or that it would be shipped to you and then you'd, you'd ship it out?

A: Correct, Your Honor.

{¶ 27} Third, the trial court found that after appellants saw the infomercial on television, they called SMC, who then "provided information about membership and a business plan." Appellants were told after becoming a paid member: (1) "they would

receive one-on-one coaching for 60 days"; (2) they would be provided "[i]nstruction manuals, and suggestions on methods of sale"; (3) they would be provided merchandise "catalogues, sales circulars, and brochures"; and (4) they "could purchase goods, which they could mark up and re-sell." We reviewed the record and do not find the trial court abused its discretion in reaching this finding of the commercial nature of the business agreement.

{¶ 28} The record also contains Mr. Henderson's April 23, 2013 affidavit in which he averred he is a 65-year-old high school graduate "with no prior business ownership or management training or experience." He further averred, "Based upon that [2008 Tom Bosley] advertisement, I telephoned SMC and verbally agreed to their business plan and agreed to send money to them for merchandise. * * * I never consulted legal counsel before contacting SMC by phone. No attorney was present when I contacted SMC. I have no particular legal training, education or experience."

{¶ 29} Fourth, the trial court found appellants paid the membership fee over the phone via a credit card and then "purchased a gift card for website purchases of $5,195. * * * The level of membership [appellants] purchased made them eligible to order the entire catalog of goods on Defendants' website." We reviewed the record and do not find the trial court abused its discretion in reaching this finding of appellants' actual purchases.

{¶ 30} Mr. Henderson testified appellants used a credit card on June 11, 2008, to pay $264.95 for their membership with SMC. After their discussions with SMC,

13.

appellants then sent $5,195 in "cash" via two separate Western Union transactions on June 19, 2008, for the set-up, activation, and initial monthly hosting of a website "with the whole catalog" of SMC merchandise, along with the promotional materials, catalogs, and flyers for the merchandise to re-sell, and for business coaching from "a person that would help you get your site up and train you as you were going." Mrs. Henderson testified they were able to pay the $5,195 from "some money" they cashed out from mutual funds. Mr. Henderson presumed that with the "whole" SMC catalog online "everybody gets on the Internet [and] would see" his website. Mr. Henderson claimed the business coach told them their business could be up and running in three to four days. That did not happen because, "Well, you almost had to be a computer wizard, Your Honor, to sort of make it through all these things that they give you. * * * [I]t's just overwhelming, * * * you have to know what you're doing on the computer * * *."

{¶ 31} Fifth, the trial court found that within 30 days after becoming SMC members, appellants had "problems communicating with their coach," and "[appellants] cancelled the membership, rescinding the contract, without purchasing a single item." We reviewed the record and do not find the trial court abused its discretion in reaching this finding.

{¶ 32} Mr. Henderson testified he first emailed SMC on July 1, 2008, to cancel the membership. He then followed up with another email to SMC on July 23, 2008. Mrs. Henderson testified she spoke with "Joey" of SMC on July 31, 2008, who told her if everything received was mailed back, the full $5,195 would be refunded. Appellants

14.

received a refund of $264.95 for their SMC membership, but never received a refund of $5,195 for the non-refundable website development. There was no merchandise to return.

> Court: Okay. But what I want to know is you, you never made any step toward ordering any goods from 'em, right?
>
> A: That's correct, sir.
>
> Court: Okay. And you never had a client at all * * * order any goods from them at all, period?
>
> A: That's correct.

{¶ 33} Sixth, the trial court found Elizabeth Moffitt established by affidavit that she is "another Ohioan [who] responded to a similar infomercial and purchased a membership, which led to Moffitt selling items from SMC's catalog actively over six (6) years. Moffitt ordered goods from SMC's catalog, which SMC shipped to Ohio." We reviewed the record and do not find the trial court abused its discretion in reaching this finding.

{¶ 34} The record contains the unrebutted affidavit of Ms. Moffitt in which she averred:

> In or about July of 2003, I signed up with Specialty Merchandise Corp. (SMC) and purchased a membership kit for the purpose of selling items from the SMC catalog to third-party purchasers. In or about late 2011 or early 2012, I terminated my business relationship with SMC.

15.

Between 2003 and 2009 I actively did business with SMC. All products I ordered from SMC were shipped by them to me in Ohio during this time period. I first learned of the SMC business opportunity as a resident of Xenia, Ohio through television infomercial advertising featuring spokesman Tom Bosley. That infomercial aired on a local Ohio television station that I received in my home in Xenia, Ohio in or about July of 2003.

{¶ 35} Finally, the trial court found there was evidence of an intent for a profitable, ongoing business relationship between the parties. The trial court found appellants purchased a membership, and rescinded it "without purchasing a single item." We reviewed the record and do not find the trial court abused its discretion in reaching this finding of the intent of the parties.

{¶ 36} The trial court found Ms. Moffitt, another Ohioan, substantiated "how this business enterprise worked." However, the trial court did not reference the July 18, 2017 affidavit by Michelle Myers-Honaker, on which appellants rely to support their assertion of continuous and ongoing contacts by SMC with Ohioans. The record contains the unrebutted, brief affidavit of Ms. Myers-Honaker in which she averred she is an Akron, Ohio resident and that sometime in 2001 "and for several years thereafter" she saw the Tom Bosley infomercial in her home on a local television channel she can no longer recall. She avers, "I contacted SMC after this infomercial and requested additional information on the company and its business opportunities." Ms. Myers-Honaker does not aver anything further beyond contacting SMC in California.

16.

{¶ 37} We reviewed de novo the entire record and find there is a preponderance of evidence to support the trial court's determination in support of the first step of personal jurisdiction analysis. The trial court did not abuse its discretion when it determined it had personal jurisdiction over SMC, and not over SMC Promotions or EMC, pursuant to R.C. 2307.382(A)(1). We will proceed to analyze the second step of personal jurisdiction analysis for SMC.

## B. Due Process

{¶ 38} Our second step in the two-step analysis for personal jurisdiction over SMC is to evaluate the due process standards from *Internatl. Shoe Co. v. State of Wash., Office of Unemp. Comp. & Placement*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945) and its progeny. *Fraley*, 138 Ohio St.3d 250, 2014-Ohio-452, 6 N.E.3d 9, at ¶ 30. Appellants must demonstrate SMC has certain "'minimum contacts'" in Ohio that "'does not offend traditional notions of fair play and substantial justice.'" *Id.*, quoting *Internatl. Shoe* at 316.

{¶ 39} "Personal jurisdiction can be either general or specific, depending upon the nature of the contacts that the defendant has with the forum state." *Kauffman Racing*, 126 Ohio St.3d 81, 2010-Ohio-2551, 930 N.E.2d 784, at ¶ 46. General personal jurisdiction is found where SMC's contacts with Ohio are of "'a continuous and systematic nature'" that Ohio may exercise personal jurisdiction over SMC even if the litigation is unrelated to SMC's contacts with Ohio. *Id.*, quoting *Bird v. Parsons*, 289

17.

F.3d 865, 873 (6th Cir.2002). Specific jurisdiction is found if SMC's contacts with Ohio satisfy a three-part test established by the Ohio Supreme Court. *Id.* at ¶ 48-49.

### 1. General Personal Jurisdiction

{¶ 40} Appellants argue the trial court had general personal jurisdiction over SMC because the trial court "essentially found" R.C. 2307.382(A)(1), (2) and (4) were satisfied where SMC deliberately pursued benefits of doing business in Ohio. Appellants further argue SMC's continuous and systematic contacts with appellants, Ms. Moffitt and Ms. Myers-Honaker, all Ohioans, establish SMC reasonably expected to be haled into an Ohio court. While they dispute the "Rules" formed part of the agreed-upon contract between the parties, they, nevertheless, argue the "Rules" proved SMC reasonably expected to be haled into a court in Ohio.

{¶ 41} In response, SMC points to appellants' waiver of their general personal jurisdiction claim because they failed to raise it before the trial court. SMC further argues the trial court found there was insufficient evidence in the record for general personal jurisdiction.

{¶ 42} Although general personal jurisdiction is currently a part of Ohio jurisprudence, SMC points us to *Daimler AG v. Bauman*, 571 U.S. 117, 127-29, 134 S.Ct. 746, 187 L.Ed.2d 624 (2014), to support their argument that general jurisdiction is now the disfavored jurisdiction theory over specific jurisdiction because contacts for general jurisdiction have to be so continuous and systematic as to render the non-resident

18.

defendant "at home" in the forum state. We find there is some support in Ohio for that interpretation. *Fern Exposition Servs., L.L.C. v. Lenhof*, 1st Dist. Hamilton No. C-130791, 2014-Ohio-3246, ¶ 18-19. We further find that the U.S. Sixth Circuit Court of Appeals has opined "Ohio law does not appear to recognize general jurisdiction over non-resident defendants, but instead requires that the court find specific jurisdiction under one of the bases of jurisdiction listed in Ohio's long-arm statute." *Conn v. Zakharov*, 667 F.3d 705, 717 (6th Cir.2012), citing *Goldstein*, 70 Ohio St.3d at 238, 638 N.E.2d 541, fn. 1.

{¶ 43} Nevertheless, we will not address appellants' claim the trial court had general personal jurisdiction over SMC. The trial court's December 20, 2017 judgment entry clearly states, "this Court is not going beyond analyzing R.C. § 2307.382(A)(1) * * *." In addition, the trial court made no determination on general personal jurisdiction because appellants did not raise that argument: "Here, Plaintiffs are not arguing general jurisdiction and this Court cannot find from what has been presented that SMC has continuous and systematic contacts such that general jurisdiction would apply." We decline to rule on the issue of general personal jurisdiction for the first time on appeal. App.R. 12(A)(1)(c)(2); *see Paul Cheatham IRA v. Huntington Natl. Bank*, 2017-Ohio-9234, 102 N.E.3d 597, ¶ 29 (6th Dist.), *rev'd on other grounds*, *Paul Cheatham IRA v. Huntington Natl. Bank*, Slip Opinion No. 2019-Ohio-3342.

19.

## 2. Specific Personal Jurisdiction

{¶ 44} Appellants also argue the trial court had specific personal jurisdiction over SMC because this litigation arose from or is related to SMC's contacts in 2008 with the appellants in Ohio. Appellants argue that because the trial court found SMC was "transacting any business" in Ohio pursuant to R.C. 2307.382(A)(1), "it was this transacting of an *intended* ongoing nature that gave rise to Appellants' causes of action." (Emphasis sic.) Appellants also argue their facts are unique, and the trial court confused the re-sale of merchandise from the sale of goods and services when appellants sold the business opportunity plan to appellants.

{¶ 45} In response, SMC essentially argues the trial court had no specific personal jurisdiction over SMC pursuant to the exclusive forum-selection clause and to *Walden v. Fiore*, 571 U.S. 277, 285-286, 134 S.Ct. 1115, 188 L.Ed.2d 12 (2014).

### a. Forum-Selection Clause

{¶ 46} We must first address the forum-selection clause issue. In support of their second assignment of error, appellants argue the trial court erred in reversing its prior decision to not enforce the California forum-selection clause contained in an online document because "no evidence exists" that appellants ever agreed to its terms.

{¶ 47} In response, SMC argues the trial court did not err. Although SMC urges this court to apply California law to analyze the forum-selection clause in this matter, we find appellants did not raise the California choice-of-law clause of the contract as an assignment of error for our review, and we decline to do so here. App.R. 12(A)(1)(c)(2).

20.

{¶ 48} A court's personal jurisdiction over a party is a waivable right, "and there are a variety of legal arrangements whereby litigants may consent to the personal jurisdiction of a particular court system." *Kennecorp Mtge. Brokers, Inc. v. Country Club Convalescent Hosp., Inc.*, 66 Ohio St.3d 173, 175, 610 N.E.2d 987 (1993). The use of a forum-selection clause is one method whereby contracting parties may agree to submit to the jurisdiction of a particular court. *Original Pizza Pan v. CWC Sports Group, Inc.*, 194 Ohio App.3d 50, 2011-Ohio-1684, 954 N.E.2d 1220, ¶ 11 (8th Dist.). We previously determined SMC did not consent to the personal jurisdiction of the Ohio courts. *Henderson*, 6th Dist. Erie Nos. E-12-068, E-13-047, 2014-Ohio-4634, at ¶ 54. The issue before us is whether appellants consented to the exclusive personal jurisdiction of California pursuant to the forum-selection clause of their membership agreement with SMC.

{¶ 49} We review de novo as a question of law the enforceability of a forum-selection clause. *Original Pizza* at ¶ 10. Appellants bear the heavy burden of showing that enforcement of a valid forum-selection clause should not be enforced. *Id.* A valid forum-selection clause is not appropriately reviewed under a minimum contacts analysis because the clause is valid irrespective of the number of contacts involved with the forum state. *Kennecorp* at 174-175.

{¶ 50} It is undisputed in the record appellants called SMC and verbally purchased a membership for $264.95. Mr. Henderson testified that, although he never signed any documents, he considered himself an SMC member entitled to the member benefits he

purchased, and when he did not feel that he received those benefits, he read and followed the membership agreement terms to cancel his membership within 30 days. The trial court found in its December 20, 2017 decision that "all membership agreements, including this one, had forum selection clauses/choice of law and arbitration provisions that any dispute be litigated by arbitration in California." The SMC membership agreement in the record contains clause No. 10 stating, in relevant part, "You consent to the exclusive personal jurisdiction and venue in Los Angeles County, California, and agree that it shall be the sole forum and venue for any and all disputes involving SMC, including without limitation small claims actions."

{¶ 51} Forum-selection clauses are classified as either permissive or mandatory. *Huber v. Inpatient Med. Services, Inc.*, 2018-Ohio-4686, 124 N.E.3d 382, ¶ 14 (9th Dist.). A permissive clause authorizes jurisdiction in the designated forum but does not prohibit litigation elsewhere while a mandatory clause fixes jurisdiction and venue in a designated forum using words of exclusivity. *Id.* By the clear language of the SMC membership agreement, we find the forum-selection clause designated Los Angeles County, California with exclusive personal jurisdiction and venue over the parties.

{¶ 52} We previously determined a forum-selection clause contained in the express terms of a commercial agreement was generally enforceable. *Henderson* at ¶ 52. The Ohio Supreme Court established a three-part test to determine the validity of a forum-selection clause: "(1) Are both parties to the contract commercial entities? (2) Is there evidence of fraud or overreaching? (3) Would enforcement of the clause be

22.

unreasonable and unjust?" *Preferred Capital, Inc. v. Power Eng. Group, Inc.*, 112 Ohio St.3d 429, 2007-Ohio-257, 860 N.E.2d 741, ¶ 7.

{¶ 53} First, it is undisputed the arrangement between appellants and SMC was a commercial one, not for appellants' own consumption. Throughout the record appellants repeatedly point to their arrangement with SMC as a business opportunity plan, to their intent to obtain SMC business coaching to operate their business, and to use the SMC website with the "whole catalog" to operate their business. Although appellants suggest they acted individually or as sole proprietors, the relative size or sophistication of the parties is not a material factor in the commercial context. *Id.* at ¶ 8. It is well established that parties to contracts are presumed to have read and understood them before agreeing to the terms, and a party's failure to read, who is not prevented from reading, and know the truth of the document is that party's sole responsibility. *Id.* at ¶ 10. There is no evidence in the record appellants cannot read or were prevented from reading SMC's documents.

{¶ 54} Second, a forum-selection clause in the commercial context will be upheld where there is no evidence of fraud or overreaching. *Id.* at ¶ 10. To invalidate a forum-selection clause based on fraud, plaintiff must establish that the fraud relates directly to the negotiation or acceptance as to the forum-selection clause itself, and not the contract generally. *Salehpour v. Just A Buck Licensing, Inc.*, 12th Dist. Warren No. CA2013-03-028, 2013-Ohio-4436, ¶ 14. The record does not show appellants alleged fraud with respect to the forum-selection clause itself. At most appellants argue their lack of

23.

business education and experience meant they did not understand the ramifications of the business arrangement they entered into with SMC. Appellants found the website containing the SMC membership rules confusing, in addition to trusting spokesperson Tom Bosley, but it is well established those factors do not excuse their obligations to read and understand the business arrangement they pursued with SMC. At a minimum, Mr. Henderson testified he read through the entire membership kit he received from SMC and clearly recalled the 30-day cancellation clause.

{¶ 55} Third, a forum-selection clause in the commercial context will be upheld unless enforcing the forum-selection clause would clearly be unreasonable and unjust, i.e., so long as enforcement does not deprive litigants of their day in court. *Kennecorp*, 66 Ohio St.3d at 176, 610 N.E.2d 987.

{¶ 56} In reversing its earlier decision that enforcing the forum-selection clause was unreasonable and unjust, the trial court's December 20, 2017 decision states:

> This Court [originally] found that since Plaintiffs filed bankruptcy, given the undisputed record Plaintiffs could not afford to litigate in California, the Courthouse doors would effectively be shut. With the benefit of hindsight, not only the subsequent case law of *Salehpour* but also the fact this Court awarded attorney fees of $74,150 and Plaintiff filed [a supplemental motion] seeking an additional $254,478.89 in fees and expenses, this Court would be compelled to now find that the cost to litigate this case in Ohio vis-à-vis pursuing Arbitration in California may well have

24.

been more expensive, less cost efficient and, thus, enforcing the California forum selection clause and arbitration clause would not be procedurally unconscionable. This Court would therefore vacate the judgments on this basis also.

{¶ 57} We find appellants were not deprived of their day in court. Since 2008 appellants incurred tremendous cost trying to meet their burden to show the Erie County Court of Common Pleas in Ohio had personal jurisdiction over SMC. By comparison, enforcing the forum-selection clause would not be unreasonable or unjust because the trial court found it might have been more efficient and less costly for appellants to bring their claims in California. We do not find the trial court abused its discretion when it made this finding of fact.

{¶ 58} Further, despite appellants' claims, we do not find the forum-selection clause conflicts with R.C. 1334.06(E), 1334.15(A) and 1334.10(A).

{¶ 59} First, the trial court made no findings in its December 20, 2017 decision that R.C. Chapter 1334 governed its personal jurisdiction analysis. Appellants urge us to find the trial court found R.C. Chapter 1334 applied in this matter pursuant to its September 26, 2012 decision overruling appellants' objections to the magistrate's decision on damages. However, the trial court voided that September 26, 2012 order, making its contents a legal nullity.

{¶ 60} Second, even if R.C. Chapter 1334 governed personal jurisdiction in this matter, R.C. 1334.06(E) and 1334.15(A) were not effective until September 28, 2012,

25.

which was well after the parties' contacts in 2008, and this litigation commenced in 2009. In addition, even if R.C. 1334.10(A), which was in effect in 2008, applied, it merely granted permissive jurisdiction to an appropriate Ohio court over claims under R.C. Chapter 1334. "Section 1334.10 * * * does not establish Ohio courts as the only courts able to apply the Ohio [Business Opportunities Plans Act]. * * * Conferring jurisdiction and designating an exclusive forum for adjudicating disputes are two very different concepts. That simple grant of jurisdiction does not provide an exclusive right to bring suit in an Ohio court." *Egrsco, LLC v. Evans Garment Restoration, LLC*, S.D.Ohio No. 2:09-CV-358, 2009 WL 3259423, *5 (Oct. 8, 2009). Exclusive and mandatory forum clauses are enforceable over the permissive jurisdiction under R.C. 1334.10(A). *Ohio Learning Centers, LLC v. Sylvan Learning, Inc.*, N.D.Ohio No. 1:10-CV-1062, 2010 WL 2803042, *5 (July 14, 2010), citing *Egrsco* at *4.

{¶ 61} For the foregoing reasons after a de novo review of the entire record, we find appellants failed to establish by a preponderance of the evidence the forum-selection clause in the SMC membership agreement is invalid and did not establish exclusive personal jurisdiction in California courts.

{¶ 62} Appellants' second assignment of error is not well-taken.

### b. Minimum Contacts

{¶ 63} Appellants would also not prevail under a minimum contacts analysis, even if the forum-selection clause was not valid.

26.

{¶ 64} This court recognizes a three-part test for finding minimum contacts for the purposes of specific personal jurisdiction over a non-resident defendant, in this case SMC:  (1) SMC must "purposely avail" itself of the privilege of acting in Ohio or causing a consequence in Ohio; (2) the cause of action must arise from SMC's activities in Ohio; and (3) SMC's acts or consequences caused by it must have a substantial enough connection with Ohio to make the exercise of jurisdiction over SMC reasonable.  *Ohlman Farm*, 6th Dist. Lucas No. L-13-1264, 2014-Ohio-4731, at ¶ 26.

{¶ 65} The trial court's December 20, 2017 judgment entry states a number of findings of fact with respect to its decision that it had no specific personal jurisdiction over SMC:

> 30.  This Court finds that the record before it does not establish any of the three part test for specific jurisdiction here.  While SMC engaged in national marketing infomercials, that advertising was not specifically targeted to Ohioans. * * * The evidence here is that two memberships in Ohio were created.  Plaintiff requests this Court to find more existed based on records which don't, or no longer, exist.  Plaintiff has the burden of proof and despite several years of seeking discovery managed, albeit on its own, to find one other Ohio "member." * * * It appears Plaintiffs' contact was minimal and initiated by Plaintiffs.  The fact the Plaintiff initiated business contact is often a significant indicator in determining whether the defendant deliberately pursued benefits of doing business in Ohio. * * *.

31. Moreover, all membership agreements, including this one, had forum selection clauses/choice of law and arbitration provisions that any dispute be litigated by arbitration in California. Although this fact is not determinative, it is highly indicative that defendant did not reasonably anticipate litigating in Ohio. * * *.

32. Furthermore, here, while there was an intent to establish memberships, with 'continuing obligations' whereby the member Plaintiff would buy goods which Defendants would ship to Ohio for Plaintiff to re-sell from Ohio, the particular facts of this case, is that never happened. Plaintiffs sensed something was amiss and promptly cancelled the membership without ordering a single product. In this scenario, there was no 'ongoing' or 'continuing obligation.' Had the facts been different and if Plaintiff had ordered a sizeable number of goods, over a period of time, the result would likely have been different. (Emphasis sic.)

33. Consequently, this court finds that to exercise Personal Jurisdiction over SMC (or any of the other named Defendants) in this particular case would run afoul of the Due Process Clause of the Fourteenth Amendment. This Court is therefore vacating the prior judgment entries in this case.

### c. Purposeful Availment in Ohio

{¶ 66} For the first part of the three-part minimum contacts test, we must determine whether SMC purposely availed itself of the privilege of acting in or causing a consequence in Ohio. "Purposeful availment" means SMC's contacts with Ohio proximately resulted from SMC's own actions that created a substantial connection with Ohio such that SMC should reasonably anticipate being haled into court in Ohio. *Kauffman Racing*, 126 Ohio St.3d 81, 2010-Ohio-2551, 930 N.E.2d 784, at ¶ 51. "Purposeful availment" does not include random, fortuitous, or attenuated contacts or the unilateral activity of another. *Id.*

{¶ 67} We first find that appellants' emphasis on the role of the internet to establish SMC submitted to personal jurisdiction in Ohio must still meet all traditional jurisdiction principles. *Kauffman Racing* at ¶ 25. "'[T]he Internet does not pose unique jurisdictional challenges. People have been inflicting injury on each other from afar for a long time. Although the Internet may have increased the quantity of these occurrences, it has not created problems that are qualitatively more difficult.'" (Citations omitted.) *Id.* "Personal jurisdiction exists only in forums in which a party has purposeful, deliberate contact, not random contact occasioned by the wide accessibility of the internet." *In re Blue Flame Energy Corp.*, 171 Ohio App.3d 514, 2006-Ohio-6892, 871 N.E.2d 1227, ¶ 22 (10th Dist.).

{¶ 68} Mere foreseeability that SMC's website might cause appellants harm in Ohio is insufficient, standing alone, to justify a finding SMC purposely availed itself of

29.

the privilege of operating in Ohio. *James v. Hoffman*, 2018-Ohio-2422, 112 N.E.3d 447, ¶ 25 (2d Dist.). The record shows appellants interacted with SMC's website to download information about membership and, after becoming a member, login and conduct some of the tasks related to their membership. However, there is nothing in the record to indicate SMC's website targeted Ohioans. "'A defendant purposefully avails itself of the privilege of acting in a state through its website if the website is interactive to a degree that reveals specifically intended interaction with residents of the state.'" (Citation omitted.) *Kauffman Racing* at ¶ 26. Appellants must show SMC's internet actions were purposely directed toward Ohio. *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 883, 131 S.Ct. 2780, 180 L.Ed.2d 765 (2011). Appellants argue that SMC could generally foresee its advertisements and merchandise would reach potential customers in Ohio. However, we find that is not enough for Ohio to exercise personal jurisdiction where appellants admit Ohio was just one state along with the rest of the United States where SMC solicited business. *Id.* at 882. Merely predicting its merchandise would reach Ohio "is not enough." *Id.*

{¶ 69} The trial court also determined SMC did not target Ohio with its national television advertisement featuring spokesman Tom Bosley in an infomercial, and we will not disturb that finding. Appellants do not claim any particular Ohio connection by actor Tom Bosley; rather they claim it was their trust in Tom Bosley during the infomercial that caused them to call SMC in California in 2008. Appellants rely on their own testimony and affidavits in the record to claim SMC targeted Ohioans because they and

30.

two other Ohioans saw the Tom Bosley infomercial in Ohio in 2001, 2003 and 2008. However, we find those facts fail to show how SMC targeted Ohioans in light of the undisputed evidence in the record of what amounts to only an intent to serve the Ohio market, among the rest of the United States. *Id.* at 386-387; *see Kleinfeld v. Link*, 9 Ohio App.3d 29, 31, 457 N.E.2d 1187 (3d Dist.1983).

{¶ 70} The record shows appellants admit SMC's advertisements and memberships targeted the entire United States, of which Ohio is a part. For example, "Appellees were headquartered in California and sold these small business franchises by selling 'memberships' to 'members' or customers like Appellants throughout the United States, <u>including Ohio</u>." (Emphasis sic.) In another example, "In this case, Appellees purposefully directed their advertising at Ohio and other states * * *." Appellants further admit, "The evidence clearly demonstrates that Appellees nationwide television and internet advertising campaign was designed to accept business contacts from anywhere in the United States, including Ohio."

{¶ 71} Of the three Ohioans in the record who saw the Tom Bosley infomercial, only two actually entered into a business arrangement with SMC: appellants and Ms. Moffitt. Even assuming the infomercials ran continuously during the eight-year period from 2001 to 2008, it is difficult to see how two to three Ohioans out of all potential Ohio television viewers during that time establish that SMC targeted Ohioans with the national infomercial. *See Krutowsky v. Simonson*, 109 Ohio App.3d 367, 371, 672 N.E.2d 219 (9th Dist.1996).

31.

{¶ 72} There is more evidence in the record SMC did not purposely avail itself in Ohio. SMC did not contact appellants in Ohio to become members because it was appellants who called SMC in California to pursue the business arrangement and, ultimately, "verbally agreed to [SMC's] business plan." Each of the other two Ohioans also admitted they contacted SMC in California to pursue the business arrangement or enterprise. Appellants alleged SMC deficiently performed work owed to them, namely business coaching and website development, but all of that work was to be performed in California. None of SMC's merchandise, warehoused in California, was mailed to Ohio because appellants did not order any. Even if appellants ordered merchandise from SMC, appellants' customers could be located anywhere, and SMC could directly ship the merchandise from California to that customer. All payments between appellants and SMC were from appellants to SMC in California, although SMC refunded appellants' credit card the membership fee after cancellation. SMC did ship the membership kit and startup catalogs and brochures to appellants in Ohio, but that was all.

{¶ 73} We reviewed de novo the entire record and do not find SMC purposely availed itself in Ohio through its own actions. Appellants failed to establish by a preponderance of the evidence that SMC had a substantial connection with Ohio such that SMC should reasonably anticipate being haled into court in Ohio. We find no abuse of discretion by the trial court when it determined the facts for its analysis.

{¶ 74} Having failed to find support in the record for the first part of the three-part test, which is dispositive, we may end our analysis. *Krutowsky*, 109 Ohio App.3d at 371,

32.

672 N.E.2d 219; *Anilas, Inc. v. Kern*, 28 Ohio St.3d 165, 168, 502 N.E.2d 1025 (1986); *Century Marketing Corp. v. Aldrich*, 6th Dist. Wood No. WD-02-045, 2003-Ohio-1390, ¶ 23; *Dean v. Motel 6 Operating L.P.*, 134 F.3d 1269, 1275 (6th Cir.1998).

{¶ 75} After a de novo review of the record, we find the trial court did not abuse its discretion when it determined it lacked personal jurisdiction over SMC pursuant to the due process clause of the Fourteenth Amendment. We find appellants failed to establish by a preponderance of the evidence the second step of personal jurisdiction analysis. We find the court's attitude was not unreasonable, arbitrary or unconscionable when it granted appellees' motion to vacate the void default judgment.

{¶ 76} Appellants' first assignment of error is not well-taken.

### d. Conclusion

{¶ 77} In light of our decision on the first and second assignments of error, we decline to address the third and fourth assignments of error regarding damages. App.R. 12(A)(1)(c).

{¶ 78} On consideration whereof, the judgment of the Erie County Court of Common Pleas is affirmed. Appellants are ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

33.

Thomas J. Osowik, J.

_____
JUDGE

Gene A. Zmuda, J.
CONCURS AND WRITES
SEPARATELY.

_____
JUDGE

Christine E. Mayle, P.J.
DISSENTS AND WRITES
SEPARATELY.

**ZMUDA, J.**

{¶ 79} Although I fundamentally agree with the majority and would affirm the

trial court's decision, I write separately to clarify the distinction between review of the

trial court's factual findings and review of the application of the law to those facts. The

trial court's factual findings are subject to an abuse of discretion standard. *In re*

*Guardianship of Rudy*, 65 Ohio St.3d 394, 396, 604 N.E.2d 736 (1992). The trial court's

application of the law to the facts, in determining whether exercise of personal

34.

jurisdiction is proper, is reviewed de novo. *Fraley v. Estate of Oeding*, 138 Ohio St.3d 250, 2014-Ohio-452, 6 N.E.3d 9, ¶ 11.

{¶ 80} Once appellees raise a challenge to the exercise of personal jurisdiction, appellants bear the burden of demonstrating the trial court's personal jurisdiction over appellees by a preponderance of the evidence. *Fraley* at ¶ 11; *State ex rel. DeWine v. 9150 Group, L.P.*, 977 N.E.2d 112, 2012-Ohio-3339 (9th Dist.), ¶ 8, quoting *ComDoc v. Advance Print Copy Ship Ctr.*, 9th Dist. Summit No. 24212, 2009-Ohio-2998, ¶ 3. As noted by the majority, the trial court conducted an evidentiary "hearing" based on the record of sworn testimony. The evidence included testimony adduced at the 2010 damages hearing with supporting exhibits, testimony and documents submitted through affidavits, and testimony proffered by filing the deposition of appellees' designated representative, conducted after the trial court permitted limited discovery pertinent to the issue of personal jurisdiction and the two-step analysis under R.C. 2307.382 and Civ.R. 4.3(A).

{¶ 81} At the damages hearing, appellants testified regarding their introduction to the purported business venture, beginning with television advertisements featuring Tom Bosley. After reviewing the information, including terms that contained a provision for a 30-day money back guarantee, appellants paid the membership fee of $264.95 with a credit card. Mr. Henderson specifically testified that he read all the materials provided, and was reassured by the 30-day money back guarantee contained within those materials.

35.

The Standard Membership Rules, attached to the Scott Palladino Affidavit, provide at paragraph 4:

> Cancellation. If you cancel your membership within 30 days of joining SMC, you may be eligible for a refund of your membership fees (excluding shipping and handling). Call toll free 1-877-9033 for eligibility and cancellation instructions. If you cancel after 30 days, you will remain responsible for any remaining fees until paid in full.

Of significant import, prior to the present appeal, appellants did not dispute the existence of the Standard Membership Rules, relied on by appellants in pursuing a return of funds and introduced through the Palladino Affidavit. *See Henderson v. SMC Promotions, Inc.*, 6th Dist. Erie Nos. E-12-068, E-13-047, 2014-Ohio-4634 (*Henderson I*). For the first time in their appellants' brief, they now argue the existence of these Rules was never established.[1]

{¶ 82} After payment of the membership fee, appellees' representative contacted appellants and provided a password for its website, and appellees paid $5,195 to set up their own website and PayPal account, an amount chosen by appellants after speaking

---

[1] In *Henderson I*, appellants raised issues for review regarding whether a forum selection clause in a rescinded contract controlled, whether filing in an Ohio court evidenced an intent not to "be bound by the contract forum selection clause," and whether the forum selection clause in a rescinded contract was timely asserted. While appellants did challenge whether there was a "meeting of the minds" regarding these Rules, and argued that only an oral contract was formed, the trial court in the present appeal found—as fact—that the forum selection clause was part of the agreement and applicable to appellants' claims.

36.

with appellees' representative, to gain access to the whole catalog of goods offered for sale through appellees. While appellees promised a "business coach" to assist appellants in launching their business, appellants spoke to their assigned coach only once, and a subsequent "coach" never returned their calls. Appellants also received several boxes of materials, by mail, including cards, brochures, and catalogs.

{¶ 83} After their own investigation, appellants feared the venture was actually a scam, and cancelled the transaction within the 30-day money back guarantee period, evidenced by a printout of their online cancellation. Appellants returned the boxes of materials soon after, and received a return receipt dated within the 30-day period. Appellees refunded the $264.95 membership fee by crediting appellants' credit card account. Appellants sought return of the $5,195, and when appellees did not return those funds, Mrs. Henderson lodged complaints with the attorney generals in Ohio and California. Appellants' lawsuit followed, which resulted in the default judgment now challenged as void for want of personal jurisdiction.

{¶ 84} Appellees did not appear and challenge personal jurisdiction until after the trial court entered default judgment, and appellants filed their first appeal, challenging the trial court's decision to deny the award of loss of earnings damages as too speculative. Appellees sought remand, so the trial court could consider their motion to vacate the default judgment as a void judgment, rendered without personal jurisdiction over appellees. In support, appellees proffered the Palladino Affidavit, with copies of the Standard Membership Rules attached. After the trial court denied the motion, appellees

37.

filed a cross-appeal, challenging the trial court's denial of their motion to vacate the default judgment. *See Henderson I.* On October 17, 2014, we reversed the trial court's denial of appellees' motion to vacate the judgment based on the trial court's failure to apply the proper analysis, and remanded the matter for determination of personal jurisdiction. *See id.*

{¶ 85} Upon remand, the trial court permitted additional discovery, relative to the determination of personal jurisdiction. Appellants filed a motion to strike appellees' evidence, the Palladino Affidavit, offered in support of the motion to vacate judgment. By early 2017, ongoing discovery disputes had delayed proceedings, with appellants continuing to request documentation that appellees could not produce. The trial court permitted appellants to take Palladino's deposition, but by that time, Palladino had left appellees' employ and appellees were without authority to produce him as a witness. Appellants noticed a Civ.R. 30(B)(5) deposition, and appellees produced Mark Schelbert as their representative.

{¶ 86} In his deposition, Schelbert testified regarding the lack of corporate records, a result of Smart Living Company's purchase of the SMC business in 2011, and the new systems in use, separate from the outdated computers and systems in use by SMC. When questioned regarding business records that may pertain to appellees' contacts with Ohio, Schelbert indicated he had no knowledge of SMC Promotions, prior to acquisition and renaming as Smart Living Company. While Schelbert participated in the acquisition, his review of documents was typical due diligence review of financial

38.

statements and the purchase agreement, and he did not review customer lists, member accounts, shipment ledgers, or inquiry logs. The documents that Schelbert did review, moreover, were viewed electronically, and aside from the financial statements, were not preserved or accessible in 2017. Schelbert also indicated that only current customer files were retained after the purchase in 2011.

{¶ 87} While Smart Living Company attempted to transfer data into its new system, "[s]ome data was lost because [of] some failed old computer equipment" and some data was corrupted. Schelbert was also asked about an official statement provided by appellees in 2008 to the Ohio attorney general, consumer protection division, but had no knowledge of the matter. As to specific written requests for admissions served by appellants, Schelbert had no knowledge of any matters contained within those requests. Schelbert did recall speaking to Palladino about the information requested by appellants in discovery. As to the Palladino Affidavit, Schelbert was not certain of any documents Palladino would have reviewed, relative to his affidavit, stating:

> I - - I don't know specifically what documents he reviewed other than I think - - he shared with me the same information I'm sharing which is that the documents were - - didn't - - no longer existed or - - or were not available.

Schelbert further indicated that the change in computer systems and data corruption resulted in the loss of some information from the old computer systems, after the sale in 2011. Because he no longer had data for customers in Ohio in 2008, Schelbert could not

provide any information on the number of SMC members with Ohio mailing addresses, and therefore, could neither confirm nor deny the existence of Ohio members.

{¶ 88} The focus of the deposition of Schelbert was not on the existence of Standard Membership Rules, as attached to the Palladino Affidavit. Instead, appellants' counsel summed up the purpose of Schelbert's deposition as:

> My main - - and I'll be real frank with you. My focus here is to try to determine what records you've got and what you did with them and why we can't see whether there were any customers of SMC group prior to 2011 which - - you've answered a couple of times.
>
> * * *
>
> I just want to go through some of these remaining things here just to verify and determine what - - what you did in terms of attempting to get the information.

{¶ 89} After supplemental briefing on the motion to vacate judgment, the trial court entered its judgment on December 20, 2017. Prior to conducting the two-step analysis to determine whether it had personal jurisdiction over the non-resident defendants, the trial court noted the difficulties posed by the passage of time and prolonged discovery disputes. The trial court noted:

> The problem after remand was that the original Defendants sold the business and any documentation relating to any possible business dealings with any other Ohioans could not be located, or, reportedly, did not exist.

40.

As this Court expressed previously, there was not much of a record before this Court prior to the remand to determine the issue of Personal Jurisdiction and the issue itself was first raised in Defendants' Reply Brief.

{¶ 90} As to the pending motion to strike defendants' supporting affidavit and documents, the trial court noted it had granted appellants' request to depose Scott Palladino in January 2017, expanding the limited discovery previously authorized to brief the issue of long-arm jurisdiction. In February 2017, appellees informed the trial court and appellants that they no longer employed Palladino, and their inquiry to Palladino, requesting voluntary appearance for deposition, went unanswered. The trial court found:

> To the extent the two Motions filed March 15, 2017 have not been fully ruled upon, those Motions will be denied. First, this Court has attempted to permit Plaintiff to engage in limited discovery related to the issue of Defendants' contacts with Ohio. However, as to producing documentation, it appears simply not to exist. Schelbert laid out the additional issues encountered when the Defendants were sold and purchased. With respect to Palladino being deposed, Defendants are unable to produce him. Defendants have no control over this former employee. This Court notes that not only did Defendants produce an alternative witness; but Plaintiffs made no attempts to seek an Order for an out of state deposition to be honored by a California Court. In fact, deposing Palladino was an after thought by Plaintiffs. Not only did Plaintiffs not request such

a deposition until years after the Palladino affidavits were filed, but shortly after the remand, Plaintiffs did not even indicate they wanted to engage in additional discovery; it was "paper" discovery. Plaintiffs should have, and could have, requested Palladino's deposition promptly after his Affidavits were filed. By not doing so and waiting several years, Plaintiffs ran the risk they, in fact, faced – that Palladino would no longer be under Defendants' employ and control.

{¶ 91} While the trial court denied appellants' motion to strike the Palladino Affidavit, the trial court nevertheless determined that the more recent testimony of Schelbert cast doubt on the credibility of Palladino. Without relying on the Palladino Affidavit, which was not ordered stricken, the trial court found evidence that only SMC transacted business in Ohio, but also found that SMC did not have the minimum contacts necessary to satisfy "traditional notions of fair play and substantial justice." The trial court based this finding, in part, on the existence of the forum selection clause as part of the Standard Membership Rules. The trial court made the specific finding that:

> "[A]ll membership agreements, including this one, had forum selection clauses/choice of law and arbitration provisions that any dispute be litigated by arbitration in California. **Although this fact is not determinative, it is highly indicative that defendant did not reasonably anticipate litigating in Ohio.**" (Emphasis added.)

{¶ 92} The dissent disagreed with the trial court's factual finding, and—without finding any abuse of discretion—determined the evidence did not demonstrate the existence of the forum selection clause. The dissent based this factual finding on the trial court's credibility determination regarding the Palladino Affidavit. While the trial court's ruling might appear to be inconsistent, as the Palladino Affidavit lacked credibility yet the forum selection clause applied, any inconsistency may be resolved by examining the content of the testimony.

{¶ 93} The issue in Schelbert's deposition was long-arm jurisdiction, with questions focused on the identity and number of Ohio members in SMC, and documentation of business dealings with those Ohio members as evidence of appellees' contact within Ohio. To this end, the Palladino Affidavit contained attestations regarding contacts, pertinent to a two-step analysis, including the following:

> Historically, when a prospective member inquired about SMC and requested a free information packet, one was mailed to him or her. SMC then followed up with a telephone call to that person, and the member may have been offered other types of membership as well as other services not included in the printed material sent to him or her. Some of these other services may have included an e-commerce website. Today, prospective members may sign up for a free membership online to learn more about SMC.

43.

As to Palladino's attestations, the trial court noted:

> It is fairly clear from the Deposition of Schelbert that Palladino would have little personal knowledge of Defendants' business activities at the time Plaintiffs made contact with Defendants. Given the time when Palladino started with the Defendants and what documentation was available at that time per Schelbert, Palladino's attestations have suspect credibility. This Court bases its decision on the record otherwise before it and the fact Plaintiff has the burden of proof as indicated previously.

{¶ 94} The record, otherwise before the trial court, included Mr. Henderson's testimony that he had read all the materials, and especially remembered the 30-day money back guarantee. In his testimony, Mr. Henderson acknowledged that the 30-day money back guarantee language was referenced in an email communication, but he read the actual guarantee language in materials sent to him by defendants, regardless of whether he clicked on an Internet link. He stated, "The first reference before we even got into this was the packet that they sent us with all this paperwork in it." The 30-day money back guarantee was part of the Standard Membership Rules that also contained the forum selection clause, referenced in, and attached to, the Palladino Affidavit.

{¶ 95} Schelbert's testimony, moreover, did not extend to the existence of a forum selection clause in the Standard Membership Rules, but instead was limited to discovery for purposes of determining contacts and personal jurisdiction. Schelbert indicated that Palladino joined SMC in 2011, and Schelbert had no knowledge of any specific

44.

documents Palladino reviewed when drafting his 2013 affidavit, without any question regarding the ***actual documents*** attached to his affidavit. To find the forum selection clause is suspect because Palladino would not have had access to various documents, despite the inclusion of actual, unchallenged documents, contradicts the record and the trial court's factual findings. Furthermore, as we noted in *Henderson I,* the only challenge raised to the forum selection clause, previously, concerned the lack of assent to the terms, as part of a "click through" form. *See Henderson I*, 6th Dist. Erie Nos. E-12-068, E-13-047, 2014-Ohio-4634, at ¶ 36 ("While they acknowledged defendants' claim that Mr. Henderson accepted the terms by clicking a button to proceed to the EMC website, the Hendersons contended that this did not demonstrate a true meeting of the minds and that defendants' affidavit spoke in generalities and not to any specific evidence that the Hendersons had agreed to their rules.").

{¶ 96} In reviewing the record, it is clear that the evidence and the record supports the trial court's factual findings, including the finding that the forum selection clause existed, and factored into the consideration of personal jurisdiction. The trial court, accordingly, did not abuse its discretion in determining the facts upon which to apply the two-step analysis of personal jurisdiction.

{¶ 97} Considering the factual findings, and finding no abuse of discretion, I would agree with the majority's application of the law to these facts, applying de novo review to the two-step analysis. Therefore, I concur with the majority's decision.

45.

**MAYLE, P.J.**

{¶ 98} In my opinion, we must conduct a de novo review—without deference to the trial court's factual determinations—to determine whether personal jurisdiction exists. And, after a de novo review, I believe that the record demonstrates that Ohio has specific jurisdiction over SMC in this case. In addition, I do not believe that SMC can rely upon a forum-selection clause, which was contained in its standard membership rules at some point in time, because SMC did not establish that its rules contained the forum-selection clause when the appellants purchased their membership in June 2008. For that reason, I would reverse the trial court's judgment that granted SMC's motion to vacate judgment.

{¶ 99} Finally, I would address appellants' third and fourth assignments of error rather than find them moot, and I would find both of those assignments of error not well-taken.

### 1. The trial court had personal jurisdiction over SMC.

{¶ 100} "Ordinarily, we review a trial court's decision on a common-law motion to set aside a void judgment under an abuse-of-discretion standard. *Terwood v. Harrison*, 10 Ohio St.2d 170, 171, 226 N.E.2d 111 (1967). But if the challenge implicates an issue of law, we apply a de novo standard of review." *Altman v. Parker*, 1st Dist. Hamilton No. C-170683, 2018-Ohio-4583, ¶ 6, citing *Cincinnati Ins. Co. v. Emge*, 124 Ohio App.3d 61, 705 N.E.2d 408 (1st Dist.1997). "Personal jurisdiction is a question of law that appellate courts review de novo." *Kauffman Racing Equip., L.L.C. v. Roberts*, 126

Ohio St.3d 81, 2010-Ohio-2551, 930 N.E.2d 784, ¶ 27. *See, e.g., State ex rel. DeWine v. 9150 Group, L.P.*, 2012-Ohio-3339, 977 N.E.2d 112, ¶ 8 (9th Dist.) (stating that a trial court's ruling on a motion to vacate for lack of personal jurisdiction should be reviewed de novo).

{¶ 101} Specific jurisdiction applies when "a State exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum." *Kauffman Racing Equip.* at ¶ 47, quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414, 104 S.Ct 1868, 80 L.Ed.2d 404, fn. 8. Specific jurisdiction exists only if (1) the defendant "purposefully availed" himself of the privilege of acting in Ohio or causing a consequence in Ohio, (2) the cause of action arose from the defendant's activities in Ohio, and (3) the acts of the defendant, or consequences caused by the defendant's actions, have "a substantial enough connection" with Ohio to make the exercise of jurisdiction "reasonable." *Id.* at ¶ 49, quoting *Bird v. Parsons*, 289 F.3d 865, 874 (6th Cir.2002).

{¶ 102} "Purposeful availment" exists when "the defendant's contacts with the forum state "'proximately result from actions by the defendant *himself* that create a "substantial connection" with the forum State.'" *Id.* at ¶ 51, quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed. 2d 528 (1985). To be sure, a defendant has not "purposefully availed" himself of the privilege of acting in Ohio if his contacts with this state could be described as "random," "fortuitous," or "attenuated," or

47.

the result of the mere "unilateral activity of another party or third person." *Id.* On the other hand, "parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of their activities." *Burger King* at 473, quoting *Travelers Health Assn. v. Virginia*, 339 U.S. 643, 647, 70 S.Ct. 927, 94 L.Ed. 1154 (1950).

{¶ 103} Turning to the facts of this case, it is true that appellants initially became interested in SMC after viewing an infomercial advertisement with actor Tom Bosley, and that the appellants called SMC. As John Henderson testified, during that conversation "they [i.e., SMC] sort of tell you what it's going to cost for membership, and it wasn't very much." The appellants paid the "SMC Merchandise Membership" fee—$264.95—over the phone by credit card on June 12, 2008, and SMC then mailed a membership packet to appellants. The appellants' arrangement with SMC included a "free" business coach, who was supposed to coach them on an ongoing basis during the initial 60 days to get their business going. That same day, the appellants received an introductory e-mail from Kerry Cox, Chief Communications Officer for SMC, containing a number to call to schedule their first coaching session, and states "[y]ou've already been assigned a coach. Your coach's job is to work with you on the best marketing plan for your particular situation."

{¶ 104} Critically, after appellants purchased an SMC membership, an SMC representative allegedly ***called appellants in Ohio*** and ***convinced them to upgrade their***

48.

*membership* to a higher level—which required a cash payment of over $5000—so that they could receive "big, thick" catalogs with even more items to sell, materials such as brochures and "discount cards," and an internet platform on which to sell their items. As John Henderson testified:

> Q: Okay. So you signed up. And how much did you send to them?
>
> A: I think it was I want to say two, three hundred—
>
> Q: I'm talking about initially.
>
> A: About two, $300.
>
> Q. Okay. And what, what did you, what was the next communication you had from them? Did they send something to you [sic] e-mail or fax or letter or something?
>
> A: Well, then we, I believe we got more, more information ***and then they called us*** and that's where we started to get pretty interested. * * * I talked to my wife, she was there with me on the phone, and they were – they sort of reminded me of used car salesmen. ***They were really, really getting into this thing, trying to get us to do, you know, to buy in further***, you know, plus our $300 dollars we sent in * * *.
>
> * * *
>
> Q: What did, what did they – in your conversations directly with the defendants did they ever make any representations to you about how much money you could make in this business?

A: Well, that's where we get to that big, thick catalog and that's why we went that way. They said you could make 400 or 500,000 a year and so that's why we gave them the $5,000 because we could get that catalog and put that on the Internet. (Emphasis added.)

{¶ 105} Appellants then cashed out their savings accounts, and went through Western Union to send $5,195 in cash to SMC because "that's how they wanted their money." This wire transfer was done on June 19, 2008. John Henderson testified that within a day or two of this wire transfer, he spoke with his designated "coach." Henderson testified that "I think the first time he called us," although the SMC documents include a 1-800 number for members to call to set up a coaching appointment. According to Henderson, during this initial coaching session, his coach told him that it would take three to four days to get his website up and running, and the coach told him "about the business cards" he needed to buy so that he could give them to customers "for them to buy off the internet." That is, appellants were supposed to distribute these business or "discount cards" to customers and, according to Henderson, "once the customer has that discount card, that's the only way they can buy off the Internet. You had to give them a card." Presumably, these "discount cards" would have contained the unique internet address of appellants' SMC website.

{¶ 106} After this initial coaching session, however, appellants did not hear from their SMC coach again. When they tried to contact him, they were told that their coach was sick and they were given the name of another coach. That new coach, however,

never called them back.  Henderson testified that "[w]e waited, we waited, and we called again and again" to no avail.  At some point, Henderson talked to someone at SMC who told him that "they were busy putting that catalog on the Internet and getting that set up, that big, thick catalog that we wanted to put on the Internet."  In the meantime, appellants started to see "red flags" because they were having substantial difficulty trying to set up a PayPal connection on their website—which did not have any catalog items on it yet.

{¶ 107} It is true that appellants never ordered any merchandise from SMC to sell. They did, however, receive "four or five" boxes from SMC—shipped to appellants in Ohio—containing the large catalogs and other advertising materials (i.e., brochures and discount cards) that were included in the higher "level" of membership that they purchased for $5,195.  But by the time they received these boxes, appellants had already decided to cancel their membership.  Henderson testified that those boxes contained "the catalogs and a whole bunch of other stuff we never opened up.  We sent it back * * * [a]nd we never opened any of the boxes.  We just * * * sent it right back the same day." The boxes were shipped back to SMC on July 31, 2008, which Henderson says was "pretty close to when we cancelled."  He remembers calling to cancel his membership and then receiving the boxes of SMC materials shortly thereafter.

{¶ 108} Although SMC refunded the initial membership fee of $264.95, it did not return the $5,195 in cash that appellants had wired to SMC for their higher membership status—which is why this lawsuit was filed.

{¶ 109} In my view, these facts demonstrate, by a preponderance of the evidence, that there is personal jurisdiction over appellees in this case. *9150 Group, L.P.*, 2012-Ohio-3339, 977 N.E.2d 112, at ¶ 8 (plaintiff bears the burden of proving personal jurisdiction by a preponderance of the evidence). After appellants signed up for a basic membership, SMC purposefully reached out and contacted appellants in Ohio for the purpose of upselling a higher-level SMC membership for $5,195, shipped several boxes of advertising material (purchased as part of this higher-level SMC membership) to appellants in Ohio, and then refused to refund the $5,195 to appellants when they cancelled their membership. This lawsuit—which focuses on the failure of SMC to refund that $5,195 payment—is the direct and proximate result of "actions by the defendant *[itself]* that create a 'substantial connection' with the forum State." *Kauffman Racing Equip., L.L.C.*, 126 Ohio St.3d 81, 2010-Ohio-2551, 930 N.E.2d 784, at ¶ 51.

### 2. SMC did not establish that the SMC/EMC rules contained a forum-selection clause as of June 2008.

{¶ 110} In SMC's motion to vacate judgment, in addition to arguing that Ohio lacked specific personal jurisdiction over it, SMC also argued that appellants waived personal jurisdiction because they agreed to standard membership "rules" containing an exclusive forum selection clause when they joined SMC in June 2008. Appellants denied they agreed to those rules.

{¶ 111} SMC, however, submitted an affidavit from an SMC employee, Scott Palladino, dated March 16, 2013 (the "Palladino Affidavit"), in support of its motion to

52.

vacate.  Palladino states that his affidavit is based on personal knowledge and his review of SMC's "available business records."  The Palladino Affidavit attaches a copy of the "SMC Rules in effect during June 2008," and states that a copy of the SMC Rules would have been sent to Henderson with his initial membership packet.  The Palladino Affidavit also attaches a copy of the rules applicable to the e-commerce service offered by SMC's affiliate and co-defendant, eMerchantClub LLC (the "EMC Rules") that, according to his review of records, were also in effect in June 2008.  Palladino states that the company's records indicated that Henderson agreed to the EMC Rules on June 19, 2008, when he logged into the "eMerchant Club Gift Card Central Website."   The SMC Rules and the EMC Rules—Exhibits 1 and 2 to the Palladino Affidavit—contain a forum selection clause providing for "exclusive personal jurisdiction and venue in Los Angeles, California, and agree[ing] that it shall be the sole forum and venue for any and all disputes * * *."

{¶ 112} On August 2, 2013, the trial court denied SMC's motion to vacate, on the grounds that "the enforcement of the Forum Selection clause compelling Plaintiffs to litigate any dispute in California would be unreasonable and unjust and deprive them of their day in Court."  The parties then filed cross-appeals.  On October 17, 2014, this court determined that the court had erred by considering the forum selection clause before determining personal jurisdiction, and remanded the matter to the trial court for a personal jurisdiction analysis.

53.

{¶ 113} On remand, the trial court permitted appellants to conduct discovery relating to the issue of personal jurisdiction, including but not limited to discovery relating to "the factual basis" of the Palladino Affidavit—through which SMC had offered the SMC Rules and EMC Rules, containing a forum-selection clause, into the record. On January 31, 2017, the trial court ordered SMC to arrange for the deposition of Scott Palladino. But Palladino, who had left his employment with SMC in 2015, did not respond to SMC's attempts to contact him for deposition. SMC therefore produced a different witness, Mark Schelbert, who was deposed on July 10, 2017, as appellees' designated corporate representative.

{¶ 114} The trial court found that Schelbert's testimony tarnished the credibility of the Palladino Affidavit. Schelbert testified that SMC and its related entities were purchased by Smart Living Company in November of 2011. Scott Palladino joined SMC—through that corporate transaction—in 2011. Schelbert testified that most of SMC's corporate records were not preserved through the 2011 purchase. He said "the business was in significant decline with significant loss of staff and support. And many of the computer systems that we inherited—or acquired, were bad." When asked if he knew what documents Palladino could have reviewed when drafting his affidavit *in 2013*, Schelbert testified that "I—I don't know specifically what documents he reviewed other than I think he—he shared with me the same information I'm sharing which is that the documents were—didn't—no longer existed or—or were not available."

54.

**{¶ 115}** Based on this record, the trial court found that the Palladino Affidavit had "suspect credibility." It stated:

> This Court also notes that it put little credence in the Palladino Affidavits. It is fairly clear from the Deposition of Schelbert that Palladino would have little personal knowledge of Defendants' business activities at the time Plaintiffs made contact with Defendants. Given the time when Palladino started with the Defendants and what documentation was available at that time per Schelbert, Palladino's attestations have suspect credibility. This Court bases its decision on the record otherwise before it and the fact Plaintiff has the burden of proof [with respect to personal jurisdiction] as indicated previously[.]

**{¶ 116}** The trial court, therefore, disregarded the entire Palladino Affidavit because it found that it lacked credibility. But, at the same time, the trial court stated elsewhere in its opinion that "all membership agreements, including this one, had forum selection clauses/choice of law and arbitration provisions that any dispute be litigated by arbitration in California" as a factor weighing against personal jurisdiction.

**{¶ 117}** The Palladino Affidavit, however, is the *sole evidence* that the SMC and EMC membership rules contained a forum-selection clause *as of June 2008* when appellants purchased their SMC membership. Accordingly, if the entire Palladino Affidavit lacks credibility and should be disregarded, then SMC cannot meet its initial

55.

burden of establishing that there is a forum-selection clause in existence that governs this dispute.

{¶ 118} Generally speaking, we defer to a trial court's credibility determinations. *Sullinger v. Sullinger*, 6th Dist. Lucas No. L-18-1079, 2019-Ohio-1489, ¶ 44. To the extent that the credibility of the Palladino Affidavit may require a de novo review because it relates to the existence of a contract and personal jurisdiction—both of which are matters of law, *see Nexus Communications, Inc. v. Qwest Communications Corp.,* 193 Ohio App.3d 599, 2011-Ohio-1759, 953 N.E.2d 340, ¶ 32 (10th Dist*.); Starks v. Choice Hotels Internatl.,* 175 Ohio App.3d 510, 2007-Ohio-1019, 887 N.E.2d 1244, ¶ 7 (1st Dist.)—I believe that the record supports the trial court's credibility determination. Given Schelbert's deposition testimony regarding the lack of corporate documentation that existed after Standard Living's purchase of SMC in 2011, it is not clear how Palladino—who joined SMC in 2011—could have verified, in 2013, that the SMC and EMC membership rules, attached to his affidavit as exhibits, were in effect in June 2008 when appellants joined SMC. For that reason, it is my view that SMC failed to prove that a forum-selection clause is applicable to this dispute.

{¶ 119} Notably, appellees do not address the implications of the trial court's credibility determination relating to the Palladino Affidavit. Instead, appellees argue that appellants are attempting to selectively enforce one portion of the agreement (requiring a refund for cancelled membership within 30 days) while avoiding another portion of the agreement (the forum-selection clause).

{¶ 120} It is certainly true that a party cannot enforce one provision of a written contract while ignoring another provision of that same contract. *See, e.g.*, *Bohl v. Hauke*, 180 Ohio App.3d 526, 2009-Ohio-150, 906 N.E.2d 450, ¶ 19 (4th Dist.) (rejecting plaintiffs' attempt to "selectively enforce provisions of a contract"). But here, appellants are not attempting to enforce either of the written contracts that are attached to the Palladino Affidavit. Rather, at the damages hearing on January 8, 2010, John Henderson testified that he saw a 30-day guarantee *somewhere* in the initial packet of materials, but he did not have any documentary support because he "had to send that back [to SMC] in order to get our money." The only documentation that appellants relied upon to support their claim regarding a contractual "30 day guarantee" was an e-mail from SMC to Dawn Henderson—sent after the appellants cancelled their membership—which states that "[a]ll refunds are reviewed and may take up to **30 days** to process." The written SMC and EMC rules were not before the court until March 18, 2013, when appellees submitted the Palladino Affidavit in support of their motion to vacate judgment. The Palladino Affidavit would have been sufficient to establish the existence of those rules during the relevant time period *but for* the credibility issues that came to light on July 10, 2017, during the corporate deposition of SMC.

{¶ 121} Accordingly, I would reverse the trial court's judgment that granted SMC's motion to vacate judgment. In my view, there is personal jurisdiction over SMC and SMC did not meet its burden to establish the existence of an applicable forum-

57.

selection clause because, as the trial court noted, the Palladino Affidavit has "suspect credibility."

### 3. Appellants' third and fourth assignments of error.

{¶ 122} Appellants' third and fourth assignments of error are focused on the trial court's September 26, 2012 judgment, which awarded the following damages to appellants:

1) $15,585.00 pursuant to the Business Opportunity Plan Act (§1334.09(A)). (i.e., $5,195.00 times 3 equals $15,585.00)

2) $5,195.00 pursuant to the common law Fraud [sic] claim

3) $10,390.00 for Punitive Damages

4) $0 for the Breach of Contract Claim

Total amount awarded is:    $31,170.00

{¶ 123} In their third assignment of error, appellants argue that the trial court erred by refusing to deem admitted requests for admission to which appellees never responded. In those requests, appellants asked appellees to admit that appellants had been "harmed and otherwise damaged in the amount of Five Million Dollars ($5,000,000) compensatory damages" and "Ten Million Dollars ($10,000,000) punitive damages." Appellants argued that as a consequence of appellees' failure to answer these requests for admission, their damages were deemed admitted, thereby dispensing with the need for a damages hearing.  The trial court disagreed.  It concluded that it was its role to determine the appropriate amount of damages based on the evidence.

58.

{¶ 124} The magistrate conducted the damages hearing and awarded appellants $31,170. Appellants objected, arguing again that appellees' failure to respond to their requests for admission obviated the need for a damages hearing. The trial court overruled appellants' objection. It held that proof of damages must be presented before an award may be made for an unliquidated damages claim, and under Civ.R. 55(A), it was within its discretion to determine whether a hearing was needed. The court adopted the magistrate's damages award. In their third assignment of error, appellants argue that because under Civ.R. 36(A), the unanswered admissions were automatically deemed admitted, the compensatory and punitive damages constitute "stipulated damages" that were conclusively proven without the need for additional evidence.

{¶ 125} Appellants are correct that under Civ.R. 36(A), "matters set forth in * * * requests for admissions are automatically deemed admitted if they are not answered by the rule's deadline." *Gerken v. State Auto Ins. Co. of Ohio*, 2014-Ohio-4428, 20 N.E.3d 1031, ¶ 18 (4th Dist.). This rule is self-executing and does not require a motion seeking confirmation of the admissions. *Id.* Having said this, proof of damages is generally required for a claim for unliquidated damages. *Berube v. Richardson*, 2017-Ohio-1367, 89 N.E.3d 85, ¶ 10 (8th Dist.). And under Civ.R. 55(A), it is within the trial court's discretion whether to conduct a hearing to determine the amount of damages to be awarded against a defaulting party. A trial court will not be found to have abused its discretion unless its decision is "contrary to law, unreasonable, not supported by the evidence, or grossly unsound." *State v. Nisley*, 3d Dist. Hancock No. 5-13-23,

59.

2014-Ohio-981, ¶ 15, *State v. Boles*, 187 Ohio App.3d 345, 2010-Ohio-278, ¶ 16-18 (2d Dist.). In fact, "when [a] judgment is not liquidated, or only partially liquidated, it is reversible error for the trial court to enter a default judgment without holding a hearing on the damages issue." (Internal citations and quotations omitted.) *Hull v. Clem D's Auto Sales*, 2d Dist. Darke No. 2011 CA 6, 2012-Ohio-629, ¶ 7.

{¶ 126} Here, I would find no abuse of discretion in the trial court's decision to hold a hearing on appellants' claim for unliquidated damages. I would also find no abuse of discretion in requiring appellants to prove their damages rather than merely relying on unanswered requests for admission that purport to establish damages. I would also add that "punitive damages are not recoverable as of right; their allowance is discretionary." *Kelley v. Sullivan*, 8th Dist. Cuyahoga No. 106189, 2018-Ohio-1410, ¶ 16, citing *Roark v. Rydell*, 174 Ohio App.3d 186, 2007-Ohio-6873, 881 N.E.2d 333 (1st Dist.). So regardless of the effect of appellees' failure to respond to requests for admission, it was within the trial court's discretion to reject appellants' request for $10 million in punitive damages. I would find appellants' third assignment of error not well-taken.

{¶ 127} In their fourth assignment of error, appellants argue that the trial court erred in rejecting the unopposed damages opinions of their expert witness. At the damages hearing, appellants offered the expert testimony of a local business broker to assist in calculating damages from lost profits. Based on representations by appellees that SMC members could generate annual sales of $300,000 to $500,000, appellants' expert opined that the fair market value of the business was between $1,339,117 and

60.

$2,268,555. These figures were calculated using a 10-year earnings cycle. Importantly, appellants' expert rendered no opinions as to whether sales of $300,000 to $500,000 were feasible estimates.

{¶ 128} The magistrate found that while appellants' expert was credible, the damages calculations were entirely speculative given that appellants never attempted a single sale or purchased a single item for resale, the annual sales estimates "had no basis in reality," and appellees' representations about members' earning potential was "puffing." Appellants objected. The trial court agreed with the magistrate's findings. Appellants argue in their fourth assignment of error that their lost profits calculations should have been accepted because they were based on the unopposed opinions of a qualified expert, premised on logical, mathematical formulae and unopposed record evidence.

{¶ 129} I agree with the trial court that appellants' damages calculations were speculative. Appellants returned the materials they received from SMC without even opening them. They never purchased any goods and never sold any goods. While the law in Ohio allows recovery of lost profits of a new business, "such lost profits must be established with reasonable certainty * * * through the use of such evidence as expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, and any other relevant facts." *AGF, Inc. v. Great Lakes Heat Treating Co.,* 51 Ohio St.3d 177, 555 N.E.2d 634 (1990), paragraphs two and three of the syllabus.

61.

**{¶ 130}** Here, appellants offered expert testimony, but their expert witness essentially performed only a math equation. He rendered no opinions as to whether sales of $300,000 to $500,000 were feasible estimates, and appellants offered no other economic or financial data, market surveys or analyses, business records of similar enterprises, or any other relevant facts to establish that these sales figures were realistic.

**{¶ 131}** "In conducting a hearing on damages, the trial court has broad discretion in assessing the weight and credibility of the evidence of damages." *Skiver v. Wilson*, 2018-Ohio-3795, 119 N.E.3d 969, ¶ 18 (8th Dist.). I would find no abuse of discretion here in the trial court's decision rejecting appellants' lost profits calculation. I would find appellants' fourth assignment of error not well-taken.

62.

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.